**In re GRAND JURY PROCEEDINGS.**

**James Richard SCARCE,
Witness–Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 93–35333.**

United States Court of Appeals,
Ninth Circuit.

Submitted May 4, 1993.*

Decided September 17, 1993.

* The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a) and 9th Cir.R. 34–4.

Jeffry K. Finer, Finer & Pugsley, Spokane, WA, for witness-appellant.

Frank A. Wilson, Asst. U.S. Atty., Spokane, WA, for appellee.

Laurel H. Siddoway, Randall & Danskin, Spokane, WA, Michael B. Trister, Lichtman, Trister, Singer & Ross, Washington, DC, for amicus.

Before: HUG, WIGGINS, THOMPSON, Circuit Judges.

HUG, Circuit Judge:

James Richard Scarce, a Ph.D. student at the Washington State University, refused to answer certain questions propounded to him by a federal grand jury on the ground that he was entitled to a "scholar's privilege" under the First Amendment and the common law, akin to that of a reporter. On April 6, 1993, the district court rejected this claim and held Scarce in civil contempt pursuant to 28 U.S.C. § 1826 (Supp.1984). We affirmed the district court's ruling on May 6, 1993, and now write to explain our decision.

## I.

## BACKGROUND

In the late evening of August 12, 1991 or before dawn on August 13, 1991, a person or persons broke into the animal research facilities at Washington State University ("WSU") in Pullman, Washington, and stole or set free several animals and spread hydrochloric acid throughout the laboratories, causing approximately $100,000 in damages. On August 13, 1991, the Animal Liberation Front ("ALF") claimed responsibility for these acts in a press release sent by facsimile to the Spokane, Washington office of the Associated Press. Government investigators believe that Rodney Coronado ("Coronado"), known to be a member of the ALF, transmitted the press release.

From mid-July to August 14, 1991, Coronado house-sat the Pullman, Washington residence of appellant James Richard Scarce, while Scarce and his family were away on vacation. Scarce is a Ph.D. student in the Department of Sociology at WSU and has authored various publications, essays and papers on the environmental movement and animal rights groups. Scarce is also the author of *Eco–Warriors: Understanding the Radical Environmental Movement* (Noble Press 1990), a book written for general readership on militant environmental groups, including the ALF. Scarce met Coronado while doing research on *Eco–Warriors,* and wrote about Coronado's environmental group activities in that book.

On the night of August 14, 1991, Scarce, his wife and their son, returned to Pullman by plane. Coronado met them at the airport and drove them home. Upon their arrival at the residence, Scarce found at least one other

person present. Due to the fact that the Scarce family had been travelling and that the hour was late, Scarce and his family went to bed. The next morning Scarce learned, from an article reported in a local newspaper, about the vandalism at the WSU animal research facilities. Scarce, his wife Petra Uhrig, and Coronado had a discussion about the newspaper article during breakfast on August 15, 1991. Later that morning, Coronado and other unidentified persons left Scarce's residence. It is unclear whether these other individuals were present during the breakfast discussion.

Scarce and Uhrig were originally subpoenaed to testify before the grand jury in June, 1992 regarding any information they possessed concerning the WSU incident. Subsequently, the subpoenas were withdrawn, and the Government attempted to obtain relevant information through an interview with Uhrig before questioning Scarce. Uhrig provided limited information, but did confirm that Coronado house sat for her and Scarce during the relevant time period and that at least two other individuals were present with Coronado at the house.

After Scarce declined to be interviewed by the Government, he was granted immunity pursuant to 18 U.S.C. § 6001 and subpoenaed to appear before the grand jury in February, 1993. Prior to testifying, Scarce moved to quash the subpoena. In a written order, filed February 22, 1993, the district court rejected Scarce's claims of privilege under the First Amendment and federal common law. Scarce appeared before the grand jury on March 2 and 3, 1993. Scarce answered questions of a general nature but refused to testify concerning the breakfast conversation, claiming that this concerned confidential information about the WSU incident that was in furtherance of his scholarly research.

On April 6, 1993, after hearing additional argument on Scarce's claims of privilege, the district court again rejected Scarce's claims and ordered Scarce to answer the grand jury's questions. Scarce declined to respond and was held in contempt pursuant to 28 U.S.C. § 1826.

## II.

## DISCUSSION

Scarce refused to respond to certain questions propounded to him by the grand jury on the ground that those questions required him to divulge confidential information which he had gathered in the course of his sociological research. Scarce maintained that he was entitled to a "scholar's privilege," akin to that of a reporter, under the First Amendment and the federal common law. The district court held that neither provided a basis for a privilege and found Scarce in contempt. We agree with the district court's conclusions and affirm the finding of contempt.

### A. *The First Amendment*

Scarce asserts that he is privileged by the First Amendment not to disclose to the grand jury the identity of his confidential informants or the information they provided him because his conversation with those informants was incident to his work as a scholar.[1] Scarce argues that because that work involves the collection and dissemination of information to the public, he is entitled to the same privileges afforded members of the institutional press under the First Amendment's Freedom of Press Clause. Assuming without deciding that scholarly inquiry enjoys the same freedom of press protections that traditional news gathering does, and that Scarce's contact with his informants was incident to such work, we must nonetheless reject Scarce's argument. Under the circumstances presented by this case, the privilege to which Scarce lays claim by analogy simply does not exist.

In 1972, the Supreme Court considered the arguments of a number of newspaper reporters who refused to appear or testify before various grand juries regarding confidentially obtained information, on the ground that they were privileged to do so under the First Amendment. *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1971)

---

1. Scarce is joined in these arguments by amicus curiae, The American Civil Liberties Union Foundation of Washington, and the American Sociological Association.

("*Branzburg* "). The reporters argued that because effective news gathering often relies on the ability of reporters to keep confidential the identities of informants and certain information those informants provide, compelled disclosure would deter their ability to gather news and impede the free flow of information protected by the First Amendment. *Id.* at 679–80, 682, 92 S.Ct. at 2655–56, 2657. They maintained that the resulting burden on First Amendment interests outweighed any public interest in obtaining the confidential information sought by the grand jury. *Id.* at 681, 92 S.Ct. at 2656–57.

■ The Supreme Court disagreed. Skeptical of the impact compelled disclosure would have on news gathering, the Court concluded that whatever burden might result from requiring news gatherers to testify would not override "the public interest in law enforcement and in ensuring effective grand jury proceedings." *Id.* at 690, 92 S.Ct. at 2661. The Court emphasized that news gatherers are not exempt from the duty imposed on any other citizen to "respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." *Id.* at 690–91, 92 S.Ct. at 2661. The Court concluded for these reasons that the First Amendment does not provide a news gatherer a privilege to refuse to testify before a federal grand jury regarding information received in confidence.

■ The Court did note, however, that "news gathering is not without its First Amendment protections." *Id.* at 707, 92 S.Ct. at 2670. The Court stated that news gatherers will be protected from grand jury inquiries where a grand jury investigation is "instituted or conducted other than in good faith." *Id.* The Court also explained that, "[o]fficial harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification." *Id.* at 707–08, 92 S.Ct. at 2670. Justice Powell underscored this point in a separate concurrence, in which he noted that news gatherers may be entitled to First Amendment protection where the information sought "bear[s] only a remote and tenuous relationship to the subject of the investigation," or

where there is "some other reason to believe that [the] testimony implicates confidential source relationships without a legitimate need of law enforcement." *Id.* at 710, 92 S.Ct. at 2670 (Powell, J., concurring).

■ The circumstances of the present case fall squarely within those of *Branzburg.* Scarce argues that he is privileged not to answer certain questions propounded by the grand jury on the ground that doing so would require him to disclose information he acquired from confidential sources. He does not argue here, nor did he argue in the district court, that the questions were posed in bad faith, that they had a tenuous relationship to the subject of the investigation, that law enforcement did not have a legitimate need for the information, or that they were posed as a means of harassment. Under *Branzburg,* therefore, Scarce is not entitled to a First Amendment privilege.

■ Scarce insists that irrespective of bad faith, *Branzburg* grants a news gatherer a privilege not to testify to the grand jury concerning confidentially obtained information, unless the Government demonstrates that its interest in the information sought out-weighs the news gatherer's First Amendment rights. Scarce argues that the Opinion of the Court, written by Justice White, represented only a plurality of the Court and that its one-time-only balancing of the conflicting interests is not authoritative. He contends that the concurrence of Justice Powell and the dissents of the other four Justices together represent a majority view in favor of rebalancing the interests at stake in every claim of privilege made before a grand jury. This reading of *Branzburg,* however, is at odds with the majority opinion itself, and with the manner in which we have applied it in our own cases.

It is important to note that Justice White's opinion is *not* a plurality opinion. Although Justice Powell wrote a separate concurrence, he also signed Justice White's opinion, providing the fifth vote necessary to establish it as the majority opinion of the court. *See Branzburg,* 408 U.S. at 665, 92 S.Ct. at 2648–49. The Court stated:

Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do. Fair and effective law enforcement aimed at providing security for the person and property of the individual is a fundamental function of government, and the grand jury plays an important, constitutionally mandated role in this process. On the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.

*Id.* at 689–91, 92 S.Ct. at 2661.

Moreover, although Justice Powell's concurrence itself refers to "interest balancing," it does not suggest that in each case there must be balancing of the particular information sought versus the newsman's request for confidentiality. The concurring opinion states:

> As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of

all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Id.* at 709–10, 92 S.Ct. at 2670 (Powell, J., concurring). Read together with the majority opinion, with which Justice Powell concurred, this statement must be understood to mean that where a grand jury inquiry is not conducted in good faith, or where the inquiry does not involve a legitimate need of law enforcement, or has only a remote and tenuous relationship to the subject of the investigation then, the balance of interests struck by the *Branzburg* majority may not be controlling. The balancing of interests suggested by Justice Powell is in the limited circumstances he mentioned, where there is, in effect, an abuse of the grand jury function. If Justice Powell's concurrence is read more broadly, it would be inconsistent with Justice White's opinion with which he concurred. The Sixth Circuit has reached a similar conclusion. *See Storer Communications, Inc. v. Giovan,* 810 F.2d 580, 584–86 (6th Cir.1987) (rejecting claim that Justice Powell's concurrence creates a reporter's privilege or sanctions a rebalancing of interests absent questions of good faith, press harassment, or lacking relevance to a legitimate law enforcement need).

This view is supported by our own post-*Branzburg* decisions, *In re Lewis,* 501 F.2d 418 (9th Cir.1974) ("*Lewis I* "), *cert. denied,* 420 U.S. 913, 95 S.Ct. 1106, 43 L.Ed.2d 386 (1975) and *In re Lewis,* 517 F.2d 236 (9th Cir.1975) ("*Lewis II* "). In these cases, Will Lewis, the general manager of a Los Angeles radio station, refused to turn over documents and a sound recording from a group claiming responsibility for various criminal acts, and to testify regarding those matters. *Lewis II,* 517 F.2d at 237; *Lewis I,* 501 F.2d at 419–21. Lewis argued that his need for confidentiality in gathering news was protected by the First Amendment and that he was therefore privileged not to comply. After finding that there was no basis on which to conclude that the grand jury requests were posed in bad faith, or without a legitimate law enforcement purpose, we rejected Lewis' claim. *See*

*Lewis II,* 517 F.2d at 238; *Lewis I,* 501 F.2d at 422–23. We reached this conclusion without inquiring whether the grand jury's interest in the information sought outweighed Lewis' First Amendment interests in keeping it confidential.

Scarce nonetheless asserts that he is entitled to a privilege, relying on *Bursey v. United States,* 466 F.2d 1059 (9th Cir.1972), which was decided prior to the *Lewis* cases. In addition, he relies on *Farr v. Pitchess,* 522 F.2d 464 (9th Cir.1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976), which was decided after the *Lewis* cases. We conclude, however, that neither decision is applicable to the present case.

In the *Bursey* case, which was decided one day after *Branzburg,* we reversed contempt citations for failure to answer grand jury questions concerning the internal operations of a newspaper. Following a petition for rehearing, we held that our opinion was not impaired by *Branzburg,* noting the lack of a substantial connection between the information sought and the criminal conduct the Government was investigating. This is consistent with the limited area for balancing of interests described by Justice Powell and consistent with our discussion thereafter in the *Lewis* cases.

Our decision in *Farr v. Pitchess* likewise does not afford support for Scarce's position. In *Farr,* we held that a newspaper reporter did not have a First Amendment privilege to refuse to disclose to a state court the identity of an individual who had disclosed confidential information concerning a criminal trial, in violation of that court's order. *Farr,* 522 F.2d at 466, 469. We reached this conclusion by reasoning that the reporter's First Amendment interests were outweighed by the "paramount interest" of protecting "the power of the court to enforce its duty and obligation relative to the guarantee of due process to the defendants in the on-going trial." *Id.* at 469. We balanced the conflicting interests raised by that case where the societal interest was different in order to determine the existence of a privilege, but did so only because that case—unlike *Branzburg* or the present case—did not involve testimony before a grand jury. *See id.* at

468. Indeed, we acknowledged that "[t]he precise holding of *Branzburg* [had] subordinated the right of the newsmen to keep secret a source of information in [the] face of the more compelling requirement that a grand jury be able to secure factual data relating to its investigation of serious criminal conduct." *Id.* at 467–68. Rather than counselling in favor of a contrary result, *Farr* actually supports our disposition of this case.

**B.** *The Federal Common Law*

■ Scarce argues that regardless of the First Amendment, he is entitled to a scholar's privilege as a matter of federal common law, and that we should recognize such a privilege under Federal Rule of Evidence 501. This Rule provides that unless otherwise required by the Constitution, statutes or decisions of the Supreme Court, the privilege of a witness "shall be governed by the principles of the common law as they may be interpreted by the courts of United States in the light of reason and experience." Relying again on the assumption that his scholarly work is analogous to that of a reporter, Scarce maintains that federal courts have recognized the kind of privilege he asserts in refusing to answer certain grand jury questions. We are not persuaded.

In *Lewis II,* we observed that *Branzburg* cast doubt on our ability to recognize a news gathering privilege in the grand jury context as a matter of common law:

In the course of balancing the policy considerations, the Supreme Court [in *Branzburg* ] noted that the authorities were adverse to recognition of a more generally based privilege: "It is thus not surprising that the great weight of authority is that newsmen are not exempt from the normal duty of appearing before a grand jury and answering questions relevant to a criminal investigation. At common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury." 408 U.S. at 685, 92 S.Ct. at 2658.

It would be difficult to argue for a federal common law reporter's privilege to withhold confidential information from a feder-

al grand jury in the face of this recent and authoritative statement that the general common law rejects such a privilege.... *Lewis II*, 517 F.2d at 238. We are no more inclined to undermine the specific mandate of *Branzburg* now, than we were when we made this statement. Scarce cites to an array of cases in which other Courts of Appeals have held that a reporter has a qualified privilege to withhold confidential information, but we observe that those cases did not involve grand jury inquiries.[2] One district court case cited by Scarce recognized a reporter's privilege in grand jury proceedings, but we decline to follow it on the ground that it directly conflicts with the Supreme Court's holding in *Branzburg*. *See In re Williams*, 766 F.Supp. 358 (W.D.Pa 1991) *aff'd by equally divided court* 963 F.2d 567 (3d Cir. 1992) (en banc) (dispositive order without merits discussion).[3]

Scarce also cites a case for the proposition that scholars, in particular, enjoy a privilege not to disclose confidential information to a grand jury, but in truth that case does not so hold. *See In re Grand Jury Subpoena Dtd. January 4, 1984*, 750 F.2d 223 (2d Cir.1984). In that case, a sociology doctoral candidate refused a grand jury's request that he produce hundreds of pages of observations he had recorded as a waiter in a restaurant that was the subject of the grand jury's investigation. The witness had contended he was entitled to a scholar's privilege and the district court agreed.

The Second Circuit Court of Appeals reversed and remanded. The court found that the witness had raised an arguable question with respect to a scholar's privilege, but concluded that the record before it was inadequate to properly determine the existence of such a privilege. *Id.* Neither that court, nor any other that we have discovered, has actually recognized a scholar's privilege to withhold from a federal grand jury confidentially obtained information which is relevant to a legitimate grand jury inquiry and sought in good faith. Accordingly, we decline to acknowledge such a privilege as a matter of federal common law.

### III.

### CONCLUSION

For the foregoing reasons, we conclude that Scarce was not privileged to refuse to answer the questions posed by the grand jury, and the district court correctly held him in contempt.

**THE MANDATE SHALL ISSUE FORTHWITH.**

---

**2.** *See United States v. LaRouche Campaign*, 841 F.2d 1176 (1st Cir.1988) (pre-trial criminal proceeding); *Baker v. F & F Investment*, 470 F.2d 778 (2d Cir.1972) (civil action), *cert. denied*, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *United States v. Burke*, 700 F.2d 70 (2d Cir.1983) (criminal trial), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); *Riley v. City of Chester*, 612 F.2d 708 (3d Cir.1979) (civil action); *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir.1980) (criminal trial), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Silkwood v. Kerr–McGee Corp.*, 563 F.2d 433 (10th Cir.1977) (civil proceeding); *Zerilli v. Smith*, 656 F.2d 705 (D.C.Cir.1981) (civil proceeding). In one case cited by Scarce, the court actually declined to recognize a reporter's privilege in a non-grand jury proceeding. *See United States v. Steelhammer*, 561 F.2d 539 (4th Cir.

1977) (en banc) (per curiam) (affirming contempt holding for reporter's failure to testify in civil contempt proceeding).

**3.** The court justified its recognition of the privilege in part upon the premises that Fed.R.Evid. 501 had been enacted after *Branzburg*, and that this rule permitted the federal courts to develop privileges in accordance with the common law. *In re Williams*, 766 F.Supp. at 367–69. We discern nothing in the text of Rule 501, however, that sanctions the creation of privileges by federal courts in contradiction of the Supreme Court's mandate. *Cf. Storer Communications, Inc.*, 810 F.2d at 584–85 & n. 6 (suggesting that federal courts recognizing a news gatherer's privilege have done so in contradiction of the *Branzburg* majority).