In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-2753, 03-2754

MICHAEL MCKEVITT,

*Plaintiff-Appellee,*

v.

ABDON PALLASCH, *et al.*,

*Defendants-Appellants.*

Motions for Stay of Order of the
United States District Court for the
Northern District of Illinois, Eastern Division.
No. 03 C 4218—**Ronald A. Guzmán**, *Judge.*

SUBMITTED JULY 3, 2003—DECIDED JULY 3, 2003[1]
OPINION AUGUST 8, 2003

Before POSNER, MANION, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* Michael McKevitt is being prose-
cuted in Ireland for membership in a banned organization
and directing terrorism. He asked the district court for an
order pursuant to 28 U.S.C. § 1782 to produce tape re-
cordings that he thinks will be useful to him in the cross-
examination of David Rupert, who according to McKevitt's

---

[1] With notation that an explanation of the court's decision
would be forthcoming.

motion is the key witness for the prosecution. The district court obliged. Its order is directed against a group of journalists who have a contract to write Rupert's biography and who in the course of their research for the biography interviewed him; the tape recordings that they made of the interviews and are in their possession are the recordings sought in McKevitt's motion. The journalists appealed from the district court's order and asked us to stay it, which we refused to do, and the recordings were turned over to McKevitt. We now explain why we refused to issue the stay. Ordinarily the explaining could await the decision of the appeal, but not in this case, because the denial of the stay, and the resulting disclosure of the recordings to McKevitt, mooted the appeal. *Publicis Communication v. True North Communications, Inc.*, 206 F.3d 725, 727-28 (7th Cir. 2000); compare *United States v. Administrative Enterprises, Inc.*, 46 F.3d 670, 671 (7th Cir. 1995). By the time an order could be obtained and executed against McKevitt commanding the return of the recordings, he would have memorialized the information contained in them and the information would inevitably become public at his trial. The appeal was not yet moot, however, when we denied the stay, and there is no irregularity in a court's explaining the ground of a decision after the decision itself has been made ending the case. See, e.g., *FoodComm Int'l v. Barry*, 328 F.3d 300, 302 (7th Cir. 2003); *Dela Rosa v. Scottsdale Memorial Health Systems, Inc.*, 136 F.3d 1241, 1242 (9th Cir. 1998); *Dant v. District of Columbia*, 829 F.2d 69, 73 (D.C. Cir. 1987).

Section 1782(a) of the Judicial Code authorizes federal district courts to order the production of evidentiary materials for use in foreign legal proceedings, provided the materials are not privileged. The defendants claim that the tapes in question are protected from compelled disclosure by a federal common law reporter's privilege

rooted in the First Amendment. See Fed. R. 501. Although the Supreme Court in *Branzburg v. Hayes*, 408 U.S. 665 (1972), declined to recognize such a privilege, Justice Powell, whose vote was essential to the 5-4 decision reject-ing the claim of privilege, stated in a concurring opinion that such a claim should be decided on a case-by-case basis by balancing the freedom of the press against the obligation to assist in criminal proceedings. *Id.* at 709-10. Since the dissenting Justices would have gone further than Justice Powell in recognition of the reporter's privilege, and preferred his position to that of the majority opinion (for they said that his "enigmatic concurring opinion gives some hope of a more flexible view in the future," *id.* at 725), maybe his opinion should be taken to state the view of the majority of the Justices—though this is uncertain, because Justice Powell purported to join Justice White's "majority" opinion.

A large number of cases conclude, rather surprisingly in light of *Branzburg*, that there is a reporter's privilege, though they do not agree on its scope. See, e.g., *In re Madden*, 151 F.3d 125, 128-29 (3d Cir. 1998); *United States v. Smith*, 135 F.3d 963, 971 (5th Cir. 1998); *Shoen v. Shoen*, 5 F.3d 1289, 1292-93 (9th Cir. 1993); *In re Shain*, 978 F.2d 850, 852 (4th Cir. 1992); *United States v. LaRouche Campaign*, 841 F.2d 1176, 1181-82 (1st Cir. 1988); *von Bulow v. von Bulow*, 811 F.2d 136, 142 (2d Cir. 1987); *United States v. Caporale*, 806 F.2d 1487, 1504 (11th Cir. 1986). A few cases refuse to recognize the privilege, at least in cases, which *Branzburg* was but this case is not, that involve grand jury inquiries. *In re Grand Jury Proceedings*, 5 F.3d 397, 402-03 (9th Cir. 1993); *In re Grand Jury Proceedings*, 810 F.2d 580, 584-86 (6th Cir. 1987). Our court has not taken sides.

Some of the cases that recognize the privilege, such as *Madden*, essentially ignore *Branzburg*, see 151 F.3d at 128;

some treat the "majority" opinion in *Branzburg* as actually just a plurality opinion, such as *Smith*, see 135 F.3d at 968-69; some audaciously declare that *Branzburg* actually created a reporter's privilege, such as *Shoen*, 5 F.3d at 1292, and *von Bulow v. von Bulow, supra*, 811 F.2d at 142; see also cases cited in *Schoen* at 1292 n. 5, and *Farr v. Pitchess*, 522 F.2d 464, 467-68 (9th Cir. 1975). The approaches that these decisions take to the issue of privilege can certainly be questioned. See *In re Grand Jury Proceedings, supra*, 810 F.2d at, 584-86. A more important point, however, is that the Constitution is not the only source of evidentiary privileges, as the Supreme Court noted in *Branzburg* with reference to the reporter's privilege itself. 408 U.S. at 689, 706. And while the cases we have cited do not cite other possible sources of the privilege besides the First Amendment and one of them, *LaRouche*, actually denies, though without explaining why, that there might be a federal common law privilege for journalists that was not based on the First Amendment, see 841 F.2d at 1178 n. 4; see also *In re Grand Jury Proceedings, supra*, 5 F.3d at 402-03, other cases do cut the reporter's privilege free from the First Amendment. See *United States v. Cuthbertson*, 630 F.2d 139, 146 n. 1 (2d Cir. 1980); *In re Grand Jury Proceedings, supra*, 810 F.2d at 586-88; cf. *Gonzales v. National Broadcasting Co.*, 194 F.3d 29, 36 n. 2 (2d Cir. 1999).

The federal interest in cooperating in the criminal proceedings of friendly foreign nations is obvious; and it is likewise obvious that the newsgathering and reporting activities of the press are inhibited when a reporter cannot assure a confidential source of confidentiality. Yet that was *Branzburg* and it is evident from the result in that case that the interest of the press in maintaining the confidentiality of sources is not absolute. There is no conceivable interest in confidentiality in the present case. Not only is the source (Rupert) known, but he has indicated

that he does not object to the disclosure of the tapes of his interviews to McKevitt.

Some cases that recognize a reporter's privilege suggest that it can sometimes shield information in a reporter's possession that comes from a nonconfidential source; in addition to the *Madden, Schoen,* and *La Rouche* cases cited above see *Gonzales v. National Broadcasting Co., supra,* 194 F.3d at 33; *United States v. Burke,* 700 F.2d 70, 76, 78 (2d Cir. 1983); *United States v. Cuthbertson, supra,* 630 F.2d at 147. Others disagree. *United States v. Smith, supra,* 135 F.3d at 972; *In re Grand Jury Proceedings, supra,* 810 F.2d at 584-85. The cases that extend the privilege to nonconfidential sources express concern with harassment, burden, using the press as an investigative arm of government, and so forth; see the *Gonzalez, LaRouche,* and *Cuthbertson* opinions. Since these considerations were rejected by *Branzburg* even in the context of a confidential source, these courts may be skating on thin ice.

Illinois has enacted a statutory version of the reporter's privilege. 735 I.L.C.S. 5/8-901; *Desai v. Hersh,* 954 F.2d 1408, 1412 (7th Cir. 1992). But it has no application to this case. Section 1782(a) of the Judicial Code provides that "a person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any *legally applicable* privilege" (emphasis added). State-law privileges are not "legally applicable" in federal-question cases like this one. Fed. R. Evid. 501; *Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 506 (7th Cir. 1995). In any event, while the reporters' motion included a citation to the Illinois statute as part of a string cite, it failed to discuss, even minimally, why the statute should apply here. As a result, even if the statute were applicable, the reporters waived reliance on it. *Hojnacki v. Klein-Acosta,* 285 F.3d 544, 549 (7th Cir. 2002)

It seems to us that rather than speaking of privilege, courts should simply make sure that a subpoena duces tecum directed to the media, like any other subpoena duces tecum, is reasonable in the circumstances, which is the general criterion for judicial review of subpoenas. Fed. R. Crim. P. 17(c); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 993 (7th Cir. 2002); *EEOC v. Sidley Austin Brown & Wood*, 315 F.3d 696, 700 (7th Cir. 2002). We do not see why there need to be special criteria merely because the possessor of the documents or other evidence sought is a journalist. See *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991); *New York Times Co. v. Jascalevich*, 439 U.S. 1317, 1322 (1978); cf. *United States v. Ahn*, 231 F.3d 26, 37 (D.C. Cir. 2000). The approach we are suggesting has support in *Branzburg* itself, where the Court stated that "grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth." 408 U.S. at 707-08.

When the information in the reporter's possession does not come from a confidential source, it is difficult to see what possible bearing the First Amendment could have on the question of compelled disclosure. If anything, the parties to this case are reversed from the perspective of freedom of the press, which seeks to encourage publication rather than secrecy. *Florida Star v. B.J.F.*, 491 U.S. 524, 533-34 (1989). Rupert *wants* the information disclosed; it is the reporters, paradoxically, who want it secreted. The

reason they want it secreted is that the biography of him that they are planning to write will be less marketable the more information in it that has already been made public.

In other words, the reporters are concerned about McKevitt's "appropriating" their intellectual property in the tape recordings and by doing so reducing the value of that property. Disputes over intellectual property, as the Supreme Court just reminded us, are not profitably conducted in the idiom of the First Amendment. *Eldred v. Ashcroft*, 123 S. Ct. 769, 788-89 (2003). They are the subject of specialized bodies of law regulating intellectual property, such as copyright law or, of particular relevance here, the common law of misappropriation, most famously exemplified by *International News Service v. Associated Press*, 248 U.S. 215 (1918). That decision no longer is legally authoritative because it was based on the federal courts' subsequently abandoned authority to formulate common law principles in suits arising under state law though litigated in federal court. But the doctrine it announced has been adopted as the common law of a number of states, including Illinois, *Board of Trade v. Dow Jones & Co.*, 456 N.E.2d 84, 88 (Ill. 1983), and could in any event influence the formulation of federal common law evidentiary privileges.

The Associated Press and the International News Service competed in gathering news to be published in newspapers. Barred during much of World War I by British and French censors from sending war dispatches to the United States, INS would paraphrase AP's war dispatches published in east coast newspapers and was able to publish the paraphrases in west coast newspapers at the same hour because of the difference in time zones, and in east coast newspapers only a few hours later. There was no

copyright infringement, because INS was copying the facts reported in AP's dispatches rather than the dispatches themselves and anyway AP had not bothered to copyright its dispatches. Nevertheless in *International News Service v. Associated Press* the Supreme Court held that AP was entitled to enjoin INS's copying as a form of unfair competition, since INS was trying to reap where AP had sown.

The present case is sharply different, since McKevitt has no commercial motive in "stealing" the defendant reporters' work product. And yet to the extent that such "thefts" can be anticipated, the incentive to gather information, in this case for the projected biography, will be diminished, just as INS's copying AP's dispatches might have impaired AP's incentive to incur the expense of gathering news about the war. Recent cases, however in recognition of the nebulousness of misappropriation doctrine, place tight limitations on it. This is how the Second Circuit, in an influential opinion interpreting New York common law, stated the elements of the doctrine: "(i) the plaintiff generates or collects information at some cost or expense; (ii) the value of the information is highly time-sensitive; (iii) the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it; (iv) the defendant's use of the information is in direct competition with a product or service offered by the plaintiff; (v) the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality could be substantially threatened." *National Basketball Association v. Motorola, Inc.*, 105 F.3d 841, 852 (2d Cir. 1997) (citations omitted). The meat is in (v), with (i) through (iv) identifying the conditions in which the criterion stated in (v) is likely to be satisfied. It seems, then, that legal protection for the

gathering of facts is available only when unauthorized copying of the facts gathered is likely to deter the plaintiff, or others similarly situated, from gathering and disseminating those facts.

We are far from that in the present case. No showing has been made, or would be plausible, that the reporters will have to abandon the Rupert biography if the information contained in the recordings of their interviews with him is made public. It is a consideration that a district court might properly consider in deciding on a challenge to a subpoena, but it would add nothing to the court's consideration to analyze it in legal categories drawn from the First Amendment. And in this case it provides no support for the reporters' claim.

The district judge's grant of the order to produce the tape recordings for use in the Irish trial was clearly sound, and so the stay of the order was properly denied. The appeal is dismissed as moot.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*