[828 NE2d 583, 795 NYS2d 481]

The People of the State of New York, Respondent, v James Combest, Appellant.

Argued January 13, 2005; decided February 22, 2005

**POINTS OF COUNSEL**

*Appellate Advocates,* New York City (*Jonathan M. Kratter* and *Lynn W.L. Fahey* of counsel), for appellant. I. Appellant's constitutional rights to a fair trial, compulsory process, and confrontation were violated when the courts below ruled that, under Civil Rights Law § 79-h (c), he could be denied a copy of a news organization's videotape of his police precinct interrogation, which contained the best evidence of both the voluntariness of his statement and his justification defense. (*O'Neill v Oakgrove Constr.,* 71 NY2d 521; *People v. Ray,* 65 NY2d 282; *People v Jones,* 47 NY2d 528; *People v Washington,* 86 NY2d 189; *Payton v New York,* 445 US 573; *Wilson v Layne,* 526 US 603; *Arizona v Hicks,* 480 US 321; *Maryland v Garrison,* 480 US 79; *Lauro v Charles,* 219 F3d 202; *People v Whitaker,* 64 NY2d 347, 474 US 830.) II. The trial court's denial of defense counsel's challenge for cause to a prospective juror, who could say only that she would "try" to set aside her sympathy for the victim's family and decide the case based solely on the evidence but that it would be "difficult" and "there's always a but," deprived appellant of his rights to due process and an impartial jury. (*Irvin v Dowd,* 366 US 717; *People v Branch,* 46 NY2d 645; *People v Johnson,* 94 NY2d 600; *People v Arnold,* 96 NY2d 358; *People v Chambers,* 97 NY2d 417; *People v Blyden,* 55 NY2d 73; *People v Greene,* 290 AD2d 349; *People v Culhane,* 33 NY2d 90; *People v White,* 260 AD2d 413.)

*Charles J. Hynes, District Attorney,* Brooklyn (*Shulamit Rosenblum, Leonard Joblove* and *Jane S. Meyers* of counsel), for respondent. I. The Appellate Division correctly held that defendant was not entitled to release of Hybrid Films, Inc.'s videotape of his statements to the police because defendant did not satisfy the three-pronged test of Civil Rights Law § 79-h (c). Moreover,

any error resulting from defendant's inability to introduce the tape was harmless. (*Matter of Beach v Shanley*, 62 NY2d 241; *Gonzales v National Broadcasting Co., Inc.*, 194 F3d 29; *O'Neill v Oakgrove Constr.*, 71 NY2d 521; *Shoen v Shoen*, 5 F3d 1289; *Krase v Graco Children Prods., Inc.*, 79 F3d 346; *Matter of American Broadcasting Cos.*, 189 Misc 2d 805; *Matter of Brown & Williamson Tobacco Corp. v Wigand*, 228 AD2d 187; *Matter of Grand Jury Subpoenas [Maguire]*, 161 Misc 2d 960; *Matter of CBS Inc.*, 232 AD2d 291; *Simmons v United States*, 390 US 377.)

## OPINION OF THE COURT

Chief Judge KAYE.

This appeal tests the scope of the journalist's privilege in nonconfidential information in the context of criminal proceedings.

On April 16, 2000, gunfire between two groups of young men erupted across a Brooklyn intersection. When the shots concluded, a bystander, caught in the crossfire, lay dying on the sidewalk. Two days later, detectives from the Brooklyn North Homicide Task Force arrested 17-year-old defendant in his home.

Accompanying these detectives was a film crew from Hybrid Films, Inc., a production company that was in the process of creating a documentary on the Task Force for Court TV. The show, which aired later that year under the title "Brooklyn North Homicide Squad," consisted of five episodes intended to present a behind-the-scenes look at the inner workings of the Task Force. In its press release announcing the series, Court TV advertised the "unprecedented access" it had been given by the Task Force, "which allowed a crew to capture the daily activities of detectives, including their personal lives, over a period of five months." Each episode was to "focus on the discovery, investigation and resolution of a case, interweaving aspects of the detectives' personal interests and family lives."

Among the show's featured detectives was Tony Viggiani, who was assigned to question defendant after his arrest. The police thus permitted Hybrid's crew to film throughout defendant's arrest and subsequent interrogation, during which he gave oral and written statements confessing to his participation in the shootout, but attempting to explain his actions as justified by self-defense. A few hours after the police interrogation, which was filmed only by Hybrid, defendant gave a 14-minute videotaped statement to an assistant district attorney,

filmed by the prosecution.[1] According to defendant, he and his friends had been forced to return fire after being shot at by a drug dealer and his associate.

Indicted for murder and related charges, defendant served a subpoena duces tecum upon Hybrid for the production of those portions of the video and audio tapes taken during his arrest and interrogation that had not been broadcast.[2] Although Hybrid voluntarily turned over the arrest videotape that it had taken in defendant's home (that tape is no longer in issue), it moved to quash the subpoena for portions of the tapes depicting defendant's interrogation by detectives, asserting that defendant did not establish his entitlement to these tapes under the three-pronged test set forth in Civil Rights Law § 79-h (c) (the Shield Law), which affords journalists and newscasters a qualified privilege in nonconfidential news.

Without deciding the application, and over Hybrid's objection, Supreme Court ordered Hybrid to produce its tapes, under seal, for in camera review. The court ruled that defendant would, if necessary, have an opportunity during the trial of the criminal action to make the required showing under the Shield Law, and that the tapes would then be reviewed by the court to determine the existence of any relevant material and to redact any irrelevant material. However, the criminal action was subsequently transferred to a different Justice, who directed that the tapes be turned over to the parties, without review and without a showing by defendant that the three-pronged test set forth in Civil Rights Law § 79-h (c) had been satisfied. The tapes were then provided to both defendant and the People.

The following day, Hybrid obtained a stay of Supreme Court's order from the Appellate Division, and the parties were required to return the tapes to the trial court. Shortly thereafter, the Appellate Division reversed the order and remitted the matter to Supreme Court for further proceedings. The Appellate Division held that the trial court's decision had been premature, and directed the court to maintain possession of the tapes until an

---

1. The following day, while defendant was still in custody at the precinct, Hybrid obtained his signature on a release permitting exhibition of the interrogation tapes on television (but forbidding his face from being shown). Defendant subsequently disaffirmed the release on the ground of infancy (see General Obligations Law § 3-101 [1]). As it turned out, the episode involving defendant was not used in the series.

2. Defendant's videotaped statement to the prosecutor was provided to him by the People in the course of pretrial discovery.

issue concerning their release arose at trial, at which time defendant would be given an opportunity at a hearing to make the necessary showing under the Shield Law. If defendant satisfied the statutory test, the court was then to review the videotapes in camera and redact any irrelevant material prior to release (*see Matter of Hybrid Films, Inc. v Combest*, 281 AD2d 500, 501 [2001]).

The trial proceeded immediately. After the testimony of Detective Viggiani, a hearing was held on the motion to quash. Concluding that defendant had not met his burden under the Shield Law, the court granted Hybrid's motion. At the trial, defendant's statements were the only evidence connecting him to the crime, as well as supporting his justification defense. The jury, without having seen the subpoenaed tapes, acquitted defendant of murder, but convicted him of manslaughter in the first degree and criminal possession of a weapon in the second degree. The Appellate Division affirmed, holding that the trial court properly granted Hybrid's application to quash the subpoena because defendant failed to satisfy the requirements of Civil Rights Law § 79-h (c). We now reverse and order a new trial.

## The Governing Law

We first recognized a journalist's privilege in nonconfidential news in *O'Neill v Oakgrove Constr., Inc.* (71 NY2d 521 [1988]), where we determined that our state constitutional guarantee of freedom of the press requires the protection of a qualified privilege when a party to a civil lawsuit seeks nonconfidential information from a news organization (*see* NY Const, art I, § 8). Explaining that a party's request for a journalist's nonconfidential material calls for a balancing of "competing interests" (71 NY2d at 529), we established a three-pronged test that a litigant must satisfy to obtain such materials. At the same time, however, we noted without deciding that different factors might be involved in criminal cases (*see* 71 NY2d at 528 n 2).

In 1990, the Legislature enacted Civil Rights Law § 79-h (c) to codify our three-pronged test, applying it to both civil and criminal proceedings (*see* L 1990, ch 33, § 2). Under the statute, a news organization may not be required

> "to disclose any unpublished news obtained or prepared by a journalist or newscaster in the course of gathering or obtaining news . . . , or the source of

any such news, where such news was not obtained or received in confidence, unless the party seeking such news has made a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source."

Defendant contends that the Shield Law is unconstitutional as applied to criminal cases, arguing that a criminal defendant is entitled to obtain nonconfidential material possessed by a news organization even when he or she cannot meet the three-pronged showing required by the statute. He maintains that his due process rights to a fair trial, presentation of a defense, compulsory process and confrontation entitled him to obtain the nonconfidential videotapes of his own statements that were recorded by Hybrid.

As made clear in *O'Neill*, when faced with a litigant's request for information in the possession of the media, competing interests must be balanced (*see* 71 NY2d at 529). In a criminal case, defendant's interest in nonconfidential material weighs heavy. Of course, in *any* case, the interest in refusing to share nonconfidential information is significantly lower than when confidential material is at issue. When confidential material is at issue, the media may have real reason to fear that their ability to find sources willing to provide information will soon evaporate if their guarantees of confidentiality will not be honored. While we do not question the importance of nonconfidential news gathering, whose significance we recognized in *O'Neill*, defendant argues that this case involves

"no intrusions upon speech or assembly, no prior restraint or restriction on what the press may publish, and no express or implied command that the press publish what it prefers to withhold. No exaction or tax for the privilege of publishing, and no penalty, civil or criminal, related to the content of published material is at issue here. The use of confidential sources by the press is not forbidden or restricted; reporters remain free to seek news from any source by means within the law. No attempt is made to require the press to publish its sources of information or indiscriminately to disclose them on request" (*Branzburg v Hayes*, 408 US 665, 681-682 [1972]).

Thus, he contends, a reporter's privilege in nonconfidential materials does not easily overcome a criminal defendant's fair trial rights.[3]

Because in this case we conclude that defendant met his burden under the Shield Law, we need not decide what standard is constitutionally required in order to overcome a criminal defendant's substantial right to obtain relevant evidence.

## Application to this Case

It is beyond dispute that a defendant's own statements to police are highly material and relevant to a criminal prosecution. It is for this reason that such statements are always discoverable, even when the People do not intend to offer them at trial (*see* CPL 240.20 [1]; *cf.* CPL 710.30 [1] [a] [requiring notice of the People's intention to offer a defendant's statement at trial]). Further, the voluntariness of a defendant's statement is highly material and relevant when put in issue by the defense. Indeed, even when a motion to suppress a statement as involuntarily made has been litigated and denied, a defendant is not precluded "from attempting to establish at a trial that evidence introduced by the people of a pre-trial statement made by him should be disregarded by the jury or other trier of the facts on the ground that such statement was involuntarily made" (CPL 710.70). "[T]he defendant may adduce trial evidence" in support of his

---

**3.** The First, Fourth and Fifth Circuits have ruled that nonconfidential material must be turned over in criminal cases, except in the case of bad faith or harassment of a news organization (*see e.g. United States v LaRouche Campaign*, 841 F2d 1176 [1st Cir 1988]; *In re Shain*, 978 F2d 850, 852 [4th Cir 1992] ["absent evidence of governmental harassment or bad faith, the reporters have no privilege different from that of any other citizen not to testify about knowledge relevant to a criminal prosecution"]; *United States v Smith*, 135 F3d 963, 971 [5th Cir 1998] ["the media must bear the same burden of producing evidence of criminal wrongdoing as any other citizen"]). The Sixth, Seventh and Ninth Circuits have gone further, refusing to recognize the existence of *any* journalist's privilege in the context of a criminal case (*see e.g. In re Grand Jury Proceedings [Storer Communications, Inc. v Giovan]*, 810 F2d 580 [6th Cir 1987]; *McKevitt v Pallasch*, 339 F3d 530 [7th Cir 2003]; *In re Grand Jury Proceedings [Scarce v United States]*, 5 F3d 397 [9th Cir 1993], *cert denied sub nom. Scarce v United States*, 510 US 1041 [1994]). Finally, the Second Circuit has held that a reporter's privilege in nonconfidential material will be overcome in a civil case by a showing that the material is "of likely relevance to a significant issue in the case, and [is] not reasonably obtainable from other available sources"—a lower standard than that required by Civil Rights Law § 79-h (c) (*Gonzales v National Broadcasting Co., Inc.*, 194 F3d 29, 36 [2d Cir 1999]). Without specifying a standard, the *Gonzales* court noted that even less of a showing would be required in a criminal case (*see* 194 F3d at 34 n 3).

or her contention, and "the court must submit such issue to the jury under instructions to disregard such evidence upon a finding that the statement was involuntarily made" (*id.*).

Here, defendant expressed to the hearing court his intention to pursue two alternative defenses—that he acted in self-defense, and that his statements were involuntary—and to use the subpoenaed videotapes in support of those defenses. In that there was no dispute that Hybrid's tapes constituted the only depictions of his interrogation by the police, in this case defendant met his burden under Civil Rights Law § 79-h (c) as a matter of law.

Defendant contended that the tapes would support his involuntariness claim in several ways. *First*, he contended that the tapes would show the various ruses undertaken by the interrogating detective in an attempt to induce him to confess. Although the detective admitted that he at times used deception in an effort to elicit a truthful confession, he testified that he could not recall whether in this case he made any of the misleading statements specifically identified by defendant. Defendant, however, maintained that the detective had assured him that if he cooperated, he would be charged only with gun possession, whereas if he did not, he would be prosecuted for murder and subject to the death penalty (which the detective testified he knew to be untrue because of defendant's age). Defendant further asserted that he had been promised, in exchange for his cooperation, that he would get probation. *Second*, defendant contended that the tapes would show the extent to which he would have felt physically intimidated by the detective's close proximity to him. *Third*, defendant argued that the tapes would demonstrate the visibility of the detective's holstered gun, inasmuch as the detective could not recall whether his gun was in view during the interrogation.

Defendant also articulated a number of ways in which the tapes would help to establish his justification defense, as well as to negate the elements of intent and recklessness essential to the intentional and depraved indifference murder counts with which he was charged. *First*, defendant argued that the tapes contained his statement to the police that, when the shooting broke out, his car was not double-parked for a quick getaway, but had instead been parked parallel to the curb, helping to rebut the People's theory that he was the initial aggressor in a premeditated assassination attempt. *Second*, he asserted that the tapes included his statement to the detective that he was

unaware that his friend had been armed with a gun until after the shooting began. *Third*, he maintained that the tapes contained his statements that he had warned a woman to get her children off the street before he returned fire, and that he had not seen the deceased until he was hit—evidence offered to rebut depraved indifference.

That defendant was provided with the brief videotaped statement he ultimately gave to the prosecutor does not lessen the importance of the evidence he sought. Defendant was entitled to present evidence, if he could, that he had been coerced into making a statement through a variety of techniques employed during the earlier interrogation period, which occurred behind closed doors and before the People's cameras began to roll. Defendant argues that only after he had been prepared to give a calm and coherent statement was the prosecutor's camera turned on. In that event, any earlier displays of fear, upset, suggestibility, protestation—all relevant to the determination whether the statement ultimately given was voluntary—would not be memorialized, but his eventual, dispassionate (and therefore seemingly truthful and accurate) account would be.

In this case, the trial court erred in considering only the allegedly coercive statements that defendant claimed had been made to him by the police, and in analyzing each such statement in isolation. Because it found that no single alleged threat was by itself sufficient to establish that defendant's statement was involuntary, the court concluded that defendant had failed to make a clear and specific showing that the subpoenaed information was highly material and relevant, and critical or necessary to his defense. But a jury's assessment of the voluntariness of defendant's statements may, as defendant contends, involve more than an analysis of the words spoken to and by him. Here, only the tapes could establish those intangibles that might properly be considered.[4]

Finally, we note our concern with the troubling practice of the police partnering with the media to make a television show

---

4. We note that while a court is not always required to review subpoenaed material in camera in order to determine in the first instance whether the requisite showing has been made, in this case it would have been the better practice to do so. A court in a criminal case should also be mindful that "omissions, contrasts and even contradictions, vital perhaps, for discrediting a witness, are certainly not as apparent to the impartial presiding judge as to single-minded counsel for the accused" (*People v Rosario*, 9 NY2d 286, 290 [1961]).

depicting custodial interrogations. Defendant argues that by inviting Hybrid into the interrogation room, the police created an agency relationship with the film company, thereby entitling him to copies of his statements. Because we conclude that defendant established his entitlement to the videotapes under the statute, we need not decide whether the indicia of state involvement in this case rise to the level at which private conduct is transformed into state action (*see e.g. People v Ray*, 65 NY2d 282, 286 [1985]).

Nevertheless, the police may not immunize themselves from their obligation to provide defendants with copies of their own taped statements simply by letting a news organization—invited into the room by the police—operate the cameras. Defendant correctly contends that the police here allowed the film company to perform what was in fact a police function—the memorialization of an otherwise private interrogation and admission—by videotaping it, thus possessing the only recording of the event. Had the police made (or had copies of) the videotapes, they would plainly have had to provide them to defendant. Just as plainly, the film company could not have videotaped defendant's interrogation in the absence of an agreement with the police. Of course, much of the difficulty could have been avoided here had the police themselves taped the entire interrogation or conditioned access to the interrogation on Hybrid's agreement to provide the police with a copy of the resulting videotapes.[5]

---

**5.** We note that an increasing number of jurisdictions are now mandating that police questioning of arrestees be recorded, and that a resolution calling for all law enforcement agencies to videotape in their entirety the custodial interrogations of crime suspects has recently been adopted by the New York State and American Bar Associations. Currently, Alaska, Illinois, Maine, Minnesota, Texas and the District of Columbia have, by statute or case law, mandated the electronic recording of certain custodial interrogations (*see Stephan v State*, 711 P2d 1156, 1158 [Alaska 1985] [state constitutional due process]; 725 Ill Comp Stat 5/103-2.1 [homicide cases]; Me Rev Stat Ann, tit 25, § 2803-B [1] [K] [serious crimes]; *State v Scales*, 518 NW2d 587, 592 [Minn 1994] [exercise of supervisory powers]; Tex Crim Proc Code Ann art 38.22 [3] [oral and sign language statements]; DC Code Ann § 5-133.20 [crimes of violence]. *See also Commonwealth v DiGiambattista*, 442 Mass 423, 447-448, 813 NE2d 516, 533-534 [2004] [holding that a defendant whose interrogation has not been completely recorded is entitled, on request, to an instruction that "the State's highest court has expressed a preference that such interrogations be recorded whenever practicable" and that, because of the absence of recording, evidence of the defendant's alleged statement should be weighed "with great caution and care"]; *State v Barnett*, 147 NH 334, 338, 789 A2d 629, 632 [2001] [tape-recorded interrogation inadmissible unless the

In light of our determination, we do not address defendant's further contention that the trial court erred in denying his challenge for cause to a prospective juror.

Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

R.S. SMITH, J. (dissenting in part). I agree that defendant's conviction cannot be affirmed, because I think Supreme Court erred by not reviewing Hybrid's tapes in camera. I do not agree, however, that on the present record defendant has made the showing required by the Shield Law that the tapes were "critical or necessary" to the maintenance of his defense.

I

A bullet from defendant's gun killed a 15-year-old boy, Christopher Hernandez, who had the misfortune to be in the neighborhood when defendant and three other men were trying to settle a disagreement. Defendant gave written and oral statements describing the event to a police officer, and later gave an oral statement to an assistant district attorney. In accordance with common practice, the police did not tape defendant's first oral statement, though the prosecutor did tape the second, and the tape of the second statement was turned over to defendant. This case is unusual because the first oral statement was taped, with the consent of the police, by a documentary film maker, Hybrid Films, Inc., which did not give copies of the resulting tapes to either the police or the defendant.

At trial, defendant's principal defense was justification—he claimed he was firing his gun in self-defense, and he relied on the statements he had given to the police and prosecutor to support this assertion. However, defendant had moved before trial to suppress these statements, and he suggested in closing argu-

defendant's statement is recorded in its entirety]; *State v Cook*, 179 NJ 533, 562, 847 A2d 530, 547 [2004] [New Jersey Supreme Court exercises its supervisory authority to establish a committee to study and make recommendations on the use of electronic recordation of custodial interrogations]). As of summer 2004, law enforcement agencies in at least 238 cities and counties, including Los Angeles, San Francisco, San Diego and Houston, regularly record custodial interviews of suspects in felony or other serious investigations (*see* Thomas P. Sullivan, *Police Experiences with Recording Custodial Interrogations*, Northwestern University School of Law, Center on Wrongful Convictions, at 4, A1-A10 [2004] published on the Internet at <http://www.law.northwestern.edu/depts/clinic/wrongful/documents/Sullivan-Report.pdf>, cached at <http://www.courts.state.ny.us/reporter/webdocs/SullivanReport.pdf>).

ment that the tactics used by the police to obtain the statements were coercive. Thus, defendant found himself arguing, in effect: "I was coerced into making the statements that prove my innocence."

In seeking to obtain enforcement of his subpoena to Hybrid for the tapes of his first interrogation, defendant argued that the tapes could give substantial support to either or both of the contradictory themes of his defense. That is, the tapes might contain descriptions of the incident at issue that made defendant's defense of justification significantly more convincing; or they might show that he was coerced by the police. In my opinion, defendant was correct in saying that both these possibilities existed, and the possibilities were real enough that Supreme Court should have examined the tapes in camera. It cannot be said as a matter of law, on this record, that defendant did not meet the requirements for overcoming Hybrid's statutory privilege under New York's Shield Law. But I find even less basis for holding, as the majority does, that the requirements of the Shield Law *were* met here.

The Shield Law (quoted in majority op at 345-346) provides that Hybrid may not be compelled by threat of contempt to disclose its tapes unless the tapes are (1) "highly material and relevant," (2) "critical or necessary to the maintenance of [defendant's] . . . defense or proof of an issue material thereto" and (3) "not obtainable from any alternative source." I acknowledge that the first and third of these requirements are satisfied here. A defendant's recorded statement about his alleged crime will almost always, if not always, be "highly material and relevant" at a criminal trial; and certainly no evidence of defendant's first oral statement comparable in value to video and sound recordings is available from any source but Hybrid.

But I do not see how anyone can conclude, without examining the tapes, that they are "critical or necessary" to the maintenance of defendant's defense or proof of an issue material to it. The tapes might well show that defendant's interrogation by the detective was not particularly coercive (indeed, most police officers probably do not act in a coercive way when they know they are being taped), and that the version of the facts he gave to the detective was no more favorable to himself, or insignificantly so, than the version he gave to the assistant district attorney. If that is true, the second element of the statutory test is not met. I would not give the statutory words "critical or necessary" a draconian reading; I would not hold that a person

seeking to compel disclosure under that statute must show that the evidence he seeks is likely to be decisive in the case. But the words must mean, at least, that the evidence is favorable to the party seeking it in some significant way. The record does not show that that was the case here.

The majority finds the "critical or necessary" branch of the statutory test to have been met based on its recital of what the defendant *contended* that the tapes would show. I see nothing in the statute that would justify setting aside the privilege on the basis of a party's assertions, without verifying that those assertions are correct. And even apart from that, I find defendant's optimistic description of what might be in the tapes, as summarized by the majority (majority op at 348-349), to be rather unimpressive. Assuming the tapes to be exactly as defendant describes them, they fall well short of proving either that his confession was involuntary or that his killing of Christopher Hernandez was justified. Thus, while I believe Supreme Court should have examined the tapes before making its decision, I am skeptical it would have found sufficient reason to order the tapes' disclosure.

## II

Having found the Shield Law test to be met, the majority rightly does not decide whether "the Shield Law is unconstitutional as applied to criminal cases" (majority op at 346). I do not attempt to answer that question either, but my view of what the question is differs somewhat from the majority's.

To me, the constitutional question does not require *us* to balance the important "competing interests" of free press and fair trial (*see* majority op at 346-347), but only to decide whether the balance the Legislature struck in the Shield Law is within the limits set by the State and Federal Constitutions. Accordingly, I think the most relevant cases are not those cited by the majority in its summary of the issue (majority op at 347 n 3), but cases addressing the issue of when a state-law rule that prevents the presentation of evidence must give way to a criminal defendant's constitutional right to a fair trial (*see Chambers v Mississippi*, 410 US 284 [1973]; *Crane v Kentucky*, 476 US 683 [1986]; *People v Robinson*, 89 NY2d 648 [1997]). I would hold the Shield Law valid if it complies with the limitations reflected in those cases, and invalid if it does not.

I would reverse defendant's conviction solely on the ground that Supreme Court erred by not reviewing the tapes in camera, and would remit the case so that the tapes can be reviewed.

Judges G.B. SMITH, CIPARICK, ROSENBLATT, GRAFFEO and READ concur with Chief Judge KAYE; Judge R.S. SMITH dissents in part and votes to reverse and remit to Supreme Court for further proceedings in a separate opinion.

Order reversed, etc.