**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL LACEY; JIM LARKIN;
PHOENIX NEW TIMES, LLC,
              *Plaintiffs-Appellants,*

           v.

MARICOPA COUNTY, a public entity,
JOSEPH ARPAIO, Sheriff, and AVA
ARPAIO, husband and wife; DENNIS
WILENCHIK and BECKY BARTNESS,
husband and wife; JOHN DOES I-X;
JANE DOES I-X; BLACK
CORPORATIONS, I-V; and WHITE
PARTNERSHIPS, I-V,
              *Defendants-Appellees.*

No. 09-15703

D.C. No.
2:08-cv-00997-
SRB

7617

MICHAEL LACEY; JIM LARKIN;
PHOENIX NEW TIMES, LLC,
                    *Plaintiffs-Appellees,*

                    v.

JOSEPH M. ARPAIO, Sheriff and
husband; AVA ARPAIO, wife; JOHN
DOES I-X; JANE DOES I-X; BLACK
CORPORATIONS, I-V; WHITE
PARTNERSHIPS, I-V; MARICOPA
COUNTY ATTORNEY'S OFFICE, a public
entity,
                    *Defendants,*

                    and

DENNIS WILENCHIK; BECKY BARTNESS,
wife,
                    *Defendants-Appellants.*

No. 09-15806

D.C. No.
2:08-cv-00997-
SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
June 18, 2010—San Francisco, California

Filed June 9, 2011

Before: Jay S. Bybee, Timothy M. Tymkovich,* and
N. Randy Smith, Circuit Judges.

Opinion by Judge Tymkovich;
Partial Concurrence and Partial Dissent by Judge Bybee

*The Honorable Timothy M. Tymkovich, United States Circuit Judge
for the Tenth Circuit, sitting by designation.

**COUNSEL**

Michael J. Meehan, Munger Chadwick, P.L.C., Tucson, Arizona (Michael C. Manning, Leslie E. O'Hara, and John T.

White, Stinson Morrison Hecker LLP, Phoenix, Arizona, on the opening brief) for the plaintiffs/appellants/cross-appellees.

Eileen Dennis GilBride (William R. Jones, Jr., with her on the brief), Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona, for defendants/appellees/cross-appellants Joseph and Ava Arpaio.

Scott H. Zwillinger (Laura A. Freeman with him on the briefs), Zwillinger Greek Zwillinger & Knecht PC, Phoenix, Arizona, for defendants/appellees/cross-appellants Dennis Wilenchik and Becky Bartness.

Timothy J. Casey (Drew Metcalf with him on the brief), Schmitt, Schneck, Smyth & Herrod, P.C., Phoenix, Arizona, for defendants/appellees/cross-appellants Andrew Thomas, The Maricopa County Attorney's Office, and Maricopa County.

---

**OPINION**

TYMKOVICH, Circuit Judge:

This case arose from the controversial late-night arrests and subsequent release of two Phoenix newspaper executives. As a result, Michael Lacey, Jim Larkin, and Phoenix New Times, LLC (Plaintiffs) sued various officials connected with the Maricopa County Attorney's Office and the Sheriff's Office, including the county attorney, the sheriff, and a special prosecutor. They alleged the special prosecutor and possibly others ordered the arrests of Lacey and Larkin at their homes in the middle of the night after *The Phoenix New Times* newspaper published various articles critical of the officials. They claim the arrests violated their federal and state rights.

The district court dismissed many of the claims on qualified and absolute immunity grounds, and Plaintiffs appeal,

contending the district court erred in dismissing their federal claims and in remanding their remaining state claims to state court.

Having jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM in part and REVERSE in part. While many of the actions alleged here are protected by either absolute or qualified immunity, the actions of the special prosecutor in arranging Plaintiffs' arrests raise colorable claims of First and Fourth Amendment violations.

## I. Background Facts and Proceedings Below

### A. Facts

For purposes of our discussion we accept the following facts from the complaint as true and in the light most favorable to the Plaintiffs. *See Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). Plaintiffs operate an alternative weekly newspaper, *The Phoenix New Times*, which has for many years published articles and editorials highly critical of Arpaio and his policies.

The particular article that set in motion the events relevant to this litigation was published in 2004 and criticized a series of commercial land transactions involving Arpaio. In particular, the article challenged Arpaio's motives for removing his personal information from a number of public records that detailed his commercial land holdings. After the article, Arpaio justified the removal by claiming he had received death threats and therefore did not want his personal address available to the public. Plaintiffs printed a follow-up article contending Arpaio's explanation was implausible since a number of government and political party websites already contained Arpaio's personal information. To show this, the paper published in both its print and online versions Arpaio's home address, which Plaintiffs claimed they obtained from the government and political websites.

After publication of the second article, Arpaio considered criminal charges against the Plaintiffs because he believed they had violated an Arizona statute that prohibited the dissemination of personal information of law enforcement officers on the world wide web.[1] Rather than filing a contemporaneous complaint with the county attorney, however, Arpaio waited until an upcoming election, when Andrew Thomas, a political ally, was elected the new county attorney.

Arpaio met with Thomas immediately after the election to discuss his concerns regarding Plaintiffs, but not until April 2005, ten months after the publication of his personal information and two months after Thomas took office, did he request Thomas to investigate *The Phoenix New Times*. Thomas's staff reviewed the charges but concluded the case was weak, and in an internal report in August 2005 recommended Thomas decline to prosecute.

By this time, *The Phoenix New Times* had begun to publish articles critical of Thomas's own "ethical irregularities." [R., Doc. 4 at ¶ 56.] Recognizing a conflict of interest were he to prosecute the paper, Thomas referred the investigation to a neighboring jurisdiction, the Pinal County Attorney's Office. Arpaio began pressuring Pinal County to prosecute Plaintiffs. Although the sheriff sent several letters strongly urging a prosecution, the Pinal County Attorney's Office took no

---

[1]ARIZ. REV. STAT. § 13-2401(A) provides:

It is unlawful for a person to knowingly make available on the world wide web the personal information of a peace officer, justice, judge, commissioner, public defender or prosecutor if the dissemination of the personal information poses an imminent and serious threat to the peace officer's, justice's, judge's, commissioner's, public defender's or prosecutor's safety or the safety of that person's immediate family and the threat is reasonably apparent to the person making the information available on the world wide web to be serious and imminent.

Violation of the statute is a class 5 Felony. ARIZ. REV. STAT. § 13-2401(C)

action for nearly two years. Then, in 2007, it declined to prosecute and returned the matter back to Thomas.

With the case back in Maricopa County, Thomas, still recognizing his own potential conflict of interest, decided to appoint a Phoenix lawyer, Dennis Wilenchik, as special prosecutor. Wilenchik was Thomas's former law partner. He agreed to the appointment, the County approved it, and on June 26, 2007, Wilenchik took over *The Phoenix New Times* investigation.

In late August 2007, before a grand jury was sworn for the case and as part of his investigation into prosecuting *The Phoenix New Times* for violating the privacy statute, Wilenchik issued two subpoenas to Plaintiffs to produce information and documents about its operations. Arizona law requires prosecutors either (1) to present subpoenas to a grand jury for approval before issuing them, or (2) if a prosecutor issues a subpoena without receiving prior approval from a grand jury, to report the issuance to a grand jury and to the court within ten days. ARIZ. REV. STAT. § 13-4071(C). Wilenchik did neither.

The subpoenas requested information about a broad variety of subjects—including data about readers, editors, and reporters—related to any story critical of Arpaio. Plaintiffs filed a motion to quash the subpoenas, but in late September, before they had responded to the subpoenas and while their motion was pending, Plaintiffs also published a story critical of Wilenchik's investigation. In response, the very next day, Wilenchik issued a third subpoena seeking documents and information relating to that story. He issued this third subpoena again without adhering to the requirements of Arizona law. Around the time of the third subpoena, Wilenchik also attempted to arrange an ex parte meeting with the state court judge presiding over motions to quash. The judge held a closed hearing on October 11, 2007 and called Wilenchik's attempt "absolutely inappropriate." [R., Doc. 4 at ¶ 91.]

After this hearing, and weeks after they received the subpoenas, Plaintiffs decided to publish a story that included the subpoenas' demands. Doing so was seemingly in violation of ARIZ. REV. STAT. § 13-2812(A), which prohibits the publication of the nature or substance of grand jury proceedings.[2] Plaintiffs do not allege they knew the subpoenas lacked any connection with a grand jury when they published the story exposing them.

The same day, after seeing the publication of the subpoenas, Wilenchik filed a motion in state court for an Order to Show Cause demanding Plaintiffs explain their actions. The motion requested the state court hold *The Phoenix New Times* in contempt, issue arrest warrants for Plaintiffs and their lawyers, and fine Plaintiffs $90 million for publishing the contents of the subpoenas.

That night, however, without waiting for the court's decision, Wilenchik advised the police to send members of the County's Selective Enforcement Unit in unmarked, black vehicles to the homes of Michael Lacey and Jim Larkin, the publishers of The *Phoenix New Times*. The police did so and arrested the publishers, who were booked and held in county jail overnight. After a public outcry in response to the arrests, Thomas withdrew Wilenchik's appointment and disavowed involvement in the subpoenas, court proceedings, or arrests. Both Wilenchik and Arpaio have also denied ordering the arrests.

---

[2]ARIZ. REV. STAT. § 13-2812(A) provides:

> A person commits unlawful grand jury disclosure if the person knowingly discloses to another the nature or substance of any grand jury testimony or any decision, result or other matter attending a grand jury proceeding, except in the proper discharge of official duties, at the discretion of the prosecutor to inform a victim of the status of the case or when permitted by the court in furtherance of justice.

## B. Procedural History

Plaintiffs brought a number of federal and state civil rights claims against Defendants, alleging a conspiracy to violate their rights because of Plaintiffs' stories. The district court initially dismissed the claims against Thomas because he was entitled to absolute immunity, as well as the claims against the Maricopa County Attorney's Office and the Maricopa County Sheriff's Office because it found that, as subdivisions of Maricopa County, they could not be sued; rather, Plaintiffs needed to sue the county itself. The district court dismissed the federal and state claims against Wilenchik and Arpaio as inadequately pleaded but gave Plaintiffs an opportunity to amend as to those claims.

Plaintiffs filed an amended complaint, raising claims directly against Maricopa County and restating their federal and state claims against Wilenchik and Arpaio. The district court then dismissed the claims for violations of 42 U.S.C. § 1983 and conspiracy to commit violations of 42 U.S.C. § 1983 because Arpaio and Wilenchik were entitled to qualified immunity with respect to those claims. Also as to Arpaio and Wilenchik, the district court dismissed the federal and state claims for racketeering and negligence for failure to state a claim. Having dismissed the federal claims, the district court determined it no longer had pendant jurisdiction over the state law claims, and instead of revisiting them in its second order, it remanded the state law claims to Arizona state court. It also dismissed the claims against Maricopa County because it found Plaintiffs did not suffer any constitutional injury.

## II. Discussion

We begin by analyzing Plaintiffs' § 1983 claims for violations of the First, Fourth, and Fourteenth Amendments.[3] With

---

[3]Because Plaintiffs did not argue conspiracy or supervisory liability claims in their opening brief, those claims are waived.

respect to those claims, the district court granted Thomas absolute immunity and Arpaio and Wilenchik qualified immunity.

### A. Absolute Immunity

"We review a decision by a district court to afford a public official or a municipality absolute or qualified immunity de novo." *Botello v. Gammick*, 413 F.3d 971, 975 (9th Cir. 2005). The burden to establish absolute immunity rests on the defendant who wishes to use it as a defense, and the "presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Burns v. Reed*, 500 U.S. 478, 486-87 (1991).

**[1]** Not all government officials are eligible for absolute immunity. But "the Supreme Court has determined that certain government officials require absolute immunity from liability in order to enable them to function independently and effectively, without fear of intimidation or harassment. Accordingly, the Court has granted absolute immunity to . . . judges, prosecutors, . . . and officials performing quasi-judicial functions." *Fry v. Melaragno*, 939 F.2d 832, 835-36 (9th Cir. 1991) (internal quotation marks, citations, and footnote omitted). "[T]he protections of absolute immunity accorded prosecutors reflect the [dual] concern[s] that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 923 (9th Cir. 2004) (internal quotation marks omitted).

In § 1983 litigation, "both sets of concerns are present and serious." *Van de Kamp v. Goldstein*, 129 S. Ct. 855, 860 (2009). The Supreme Court has explained the "public trust of the prosecutor's office would suffer" if prosecutors are more concerned about their "own potential liability" than about

making proper prosecutorial decisions. *Imbler v. Pachtman*, 424 U.S. 409, 424 (1976). And considering the frequency with which criminal defendants bring § 1983 claims, this is a very real concern. *Van de Kamp*, 129 S. Ct. at 860. Excessive lawsuits will force prosecutors to hesitate in their decisions for fear of liability and to spend valuable and limited time defending suits rather than performing their official functions. "[I]t has been thought in the end better . . . to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation," primarily out of our desire to place prosecutors in a position to perform their public duty in the most effective way possible. *Id.* at 859 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).

**[2]** Absolute immunity protects prosecutors when they engage in prosecutorial acts, which the Supreme Court has defined as those activities "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. "A prosecutor is granted only qualified immunity, however, if he or she is performing investigatory or administrative functions, or is essentially functioning as a police officer or detective." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). When determining whether a particular action qualifies as prosecutorial, the court looks at "the nature of the function performed, not the identity of the actor who performed it." *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (quotations omitted). "[I]mmunity is justified . . . by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988).

While "the distinction between the roles of 'prosecutor' and 'investigator' [or administrator] is not always clear," our circuit and the Supreme Court have provided some guidance. *Waggy v. Spokane Cnty. Wash.*, 594 F.3d 707, 711 (9th Cir. 2010). Regarding investigatory acts, they are "normally done by police." *Genzler v. Longanbach*, 410 F.3d 630, 638 (9th

Cir. 2005). They involve "evidence gathering and witness interviewing functions normally performed by a detective or police officer." *Cousins v. Lockyer*, 568 F.3d 1063, 1068 (9th Cir. 2009) (internal quotation marks omitted).

**[3]** The most recent teaching on administrative acts comes from *Van de Kamp*, 129 S. Ct. at 861-62. In that case a unanimous Supreme Court rejected the claim that absolute immunity did not protect a county prosecutor's failure to properly train and supervise his lawyers in their obligations to disclose evidence to defense counsel. *Id.* The Court concluded there was no material difference between challenges to "general methods of supervision" and supervision of an individual trial. *Id.* at 862. Because the decisions at issue were linked to the ultimate prosecution of the plaintiff and they "necessarily require[d] legal knowledge and the exercise of related discretion," they were in fact prosecutorial. *Id.* Thus, in those instances where prosecutors engage in acts that require legal knowledge and the exercise of related discretion, absolute immunity should apply.

With this background in mind, we turn to the claims against Thomas and Wilenchik.

### 1. Thomas

Plaintiffs first contend Thomas's selection of Wilenchik as special prosecutor should not receive absolute immunity. We agree with the district court that absolute immunity attaches.

**[4]** Plaintiffs argue the hiring of another prosecutor is simply an administrative function divorced from the prosecution of a particular case. They rely on the Supreme Court's observation that "absolute prosecutorial immunity [is justified] only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Burns*, 500 U.S. at 494. Relinquishing prosecution to a special prosecutor, however, is more than mere litigation-

inducing conduct and "necessarily require[s] legal knowledge and the exercise of related [prosecutorial] discretion." *Van de Kamp*, 129 S. Ct. at 862.

Our conclusion is controlled by *Van de Kamp*. In that case, the Supreme Court considered a prosecutor's "general methods of supervision" of its prosecutors and concluded absolute immunity applied to those administrative tasks that "require legal knowledge and the exercise of discretion," including supervision of prosecutors in the way they prepare for trial. 129 S. Ct. at 862. The Court rejected the notion the supervision had to be "related to an individual trial." *Id.*

**[5]** As in *Van de Kamp*, Thomas's tasks of selecting and supervising a special prosecutor appointed for a particular case are uniquely prosecutorial functions that require legal knowledge, the exercise of discretion, and a legal analysis of the case at hand. *See id.* at 862. In that sense, they are "unlike administrative duties concerning . . . workplace hiring, payroll administration, the maintenance of physical facilities, and the like." *Id.* Appointing a special prosecutor deals specifically with the prosecutor's role as advocate, requiring an assessment of the needs of a particular case. *Genzler*, 410 F.3d at 636 ("A prosecutor is protected by absolute immunity from liability for damages under § 1983 'when performing the traditional functions of an advocate.' ") (quoting *Kalina*, 522 U.S. at 131). The decision to appoint a special prosecutor affects every aspect of litigation, including how it unfolds and if and when it will be tried. Given the requirement of legal knowledge and discretion that guides the decision, as well as the effect the decision has on litigation, the appointment of a special prosecutor is thus connected with the prosecutor's role in judicial proceedings.

**[6]** The essential decision to hire a special prosecutor because of a conflict of interest also deserves absolute immunity because it is part of deciding whether or not to prosecute—an act long protected by absolute immunity. *See*

*Hartman v. Moore*, 547 U.S. 250, 262 (2006) (explaining prosecutors are entitled to absolute immunity for "decision[s] to prosecute"). Oftentimes, when deciding to prosecute, prosecutors may recognize their own ethical conflict in a given case, and may, therefore, choose to delegate the final decision to a colleague or a special prosecutor. Such an act is sufficiently linked to the decision to prosecute that it deserves absolute immunity's full protections.

In response, Plaintiffs direct us to *Botello* for the proposition that when prosecutors are involved in hiring another prosecutor, they are engaged in an administrative function. 413 F.3d at 977. *Botello* has nothing to do with the hiring of a special prosecutor to pursue a particular case. The facts there involved a prosecutor's attempt to retaliate against a county investigator by interfering with the investigator's job prospects, and had nothing to do with a particular prosecution.

Plaintiffs fail to recognize that hiring a special prosecutor is not the same as the general hiring of attorneys for positions in the prosecutor's office. Hiring Wilenchik required Thomas to evaluate evidence and possible claims against *The Phoenix New Times*, discretionary acts sufficiently tied to legal judgment and judicial proceedings to justify absolute immunity. That the matter never resulted in a trial is immaterial—the existence of immunity does not rest on whether Wilenchik ultimately proceeded to indictment or trial, or was fired or quit in the meantime. Unlike the decision here, the routine hiring of a staff prosecutor focuses on the competencies and backgrounds of the applicants without any reference to a particular case or prosecutorial discretion. It does not require any evaluation of evidence, possible claims in a given case, nor any decision to prosecute. The hiring of a special prosecutor because of a conflict of interest or some other reason, on the other hand, involves all three.

Finally, we are persuaded also by the concerns of the Supreme Court in *Van de Kamp*. Allowing plaintiffs to chal-

lenge a prosecutor's decision in situations such as this would make conflict-concerned prosecutors hesitant to appoint special prosecutors, even when doing so would best serve the interests of justice. They would find themselves in a classic no-win situation, where choosing to appoint a special prosecutor could expose them to liability in § 1983 suits, but choosing not to appoint one could expose them to ethical investigations or worse because of their perceived or actual conflict of interest. Not only would they be hesitant to act; they may very well decide to "shade [their] decisions" to avoid personal liability. *Olsen*, 363 F.3d at 923 (citations omitted). The "impediments to the fair, efficient functioning of a prosecutorial office that liability could create" outweighs the fact that "sometimes such immunity deprives a plaintiff of compensation that he undoubtedly merits." *Van de Kamp*, 129 S. Ct. at 864.

**[7]** In sum, the considerations the Supreme Court and our circuit have given for allowing absolute immunity militate in favor of granting it in this case. We therefore affirm the district court's decision that Thomas is protected by absolute immunity.

### 2. Wilenchik

In a cross appeal, Wilenchik has appealed the district court's determination he does not qualify for absolute immunity. He argues he was not engaged in investigatory activities when he issued the document requests and had no role in the arrests following the news article about the grand jury proceedings. We agree with the district court.

As discussed above, we employ a functional analysis, looking not at the office or title of the actor but at the act performed. *Genzler*, 410 F.3d at 636. Thus, "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Id.* (quoting *Buckley*, 509 U.S. at 273). "It [does] not matter what title that person [holds]."

*Waggy*, 594 F.3d at 712 (discussing the Supreme Court's holding in *Kalina*, 522 U.S. at 127).

**[8]** Several Supreme Court cases inform our analysis. As a general matter "if a prosecutor plans and executes a raid . . . he has no greater claim to complete immunity than activities of police officers allegedly acting under his direction." *Buckley*, 509 U.S. at 274 (quotation marks omitted). Moreover, absolute immunity does not extend "to the prosecutorial function of giving legal advice to the police." *Burns*, 500 U.S. at 496. In *Burns*, the prosecutor advised the police that probable cause existed to arrest the plaintiff. The Court held the state prosecutor was entitled to absolute immunity for participating in a probable-cause hearing but not for giving legal advice to the police. *Id.* at 492-93. Given this precedent, we have emphasized, "[t]he Supreme Court has clearly stated that with respect to advising police, prosecutors are entitled to qualified not absolute immunity." *Ewing v. City of Stockton, 588 F.3d 1218, 1233 (9th Cir. 2009)*.

**[9]** As the Supreme Court recognized, it would be "incongruous to allow" Wilenchik "to be absolutely immune from liability" for advising police to make the arrests, "but to allow police officers only qualified immunity for following the advice." *Burns*, 500 U.S. at 495. Moreover, as framed by the complaint at the motion to dismiss stage, this is not a case where Wilenchik reasonably could believe he had probable cause that Plaintiffs had violated the law. Plaintiffs have successfully alleged that because Wilenchik failed to adhere to Arizona law when issuing the subpoena regarding the grand jury proceedings, he knew it was not protected grand jury material and he therefore had no probable cause to believe Plaintiffs had violated the grand jury secrecy statute. Much like the prosecutors in *Buckley*, as alleged, Wilenchik did not have probable cause to arrest the plaintiffs "or to initiate judicial proceedings during that period." 509 U.S. at 274. "A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrest-

ed." *Id.* In short, Plaintiffs have a colorable claim at this point that Wilenchik ordered the arrests and that he did not have probable cause to do so. They therefore have alleged facts sufficient to overcome Wilenchik's claim to absolute immunity. Since absolute immunity is not available to Wilenchik at the time of the arrests, we need not consider whether absolute immunity was available at earlier stages in the investigation of potential crimes arising from the privacy statute.

We emphasize, however, that discovery may result in a more complete picture of the events surrounding the grand jury proceedings and arrests—information which might support an argument that the investigation had moved to the prosecution phase. For instance, Wilenchik may be able to clarify the status of the matter before a grand jury in support of probable cause or whether charges had been filed against Plaintiffs. Or he may provide enough facts to rebut any notion he advised police or ordered the arrests. Should he do so, the district court can consider any further arguments at the summary judgment stage of the case. But at this point, the complaint alleges Wilenchik knew the subpoena was not approved by a grand jury and that he lacked probable cause to believe Plaintiffs committed a crime by publishing them.

**[10]** Thus, as it stands, Plaintiffs have sufficiently alleged Wilenchik performed an investigatory function when he advised the police to make the arrests. We therefore affirm the district court's decision not to grant Wilenchik absolute immunity for ordering the arrests.

## B. Qualified Immunity

Wilenchik and Arpaio both argue they are entitled to qualified immunity with respect to Plaintiffs' § 1983 claims. The district court agreed, and we review that decision de novo. *See Botello*, 413 F.3d at 975.

**[11]** "Qualified immunity shields public officials from civil damages for performance of discretionary functions. It is

'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.' " *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis omitted). Under qualified immunity, an officer is protected from suit when he or she "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The standard leaves "ample room for mistaken judgments." *Id.* at 343.

In the § 1983 context, determining whether a defendant is entitled to qualified immunity involves a two-pronged analysis. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).[4] Second, we must ask "whether the right was clearly established." *Id.* A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. If we answer either of the two inquiries in the negative, then the officer's conduct is protected by qualified immunity. We have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818; *see also Mueller*, 576 F.3d at 993-94.

---

[4]While not negating the substantive analysis provided for in *Saucier*, *Pearson* overruled *Saucier*'s mandate that lower courts first consider whether a constitutional violation exists before reaching whether the right at issue is clearly established. *Pearson*, 129 S. Ct. at 818. After *Pearson*, lower courts may reverse the order of battle and answer the latter question without ever answering whether a constitutional violation occurred. *Id.*

### 1. Wilenchik

Plaintiffs contend the district court erred in granting Wilenchik qualified immunity for directing the investigation, which culminated with the arrests of Lacey and Larkin. They argue Wilenchik's conduct violated various constitutional rights, and that he is liable for malicious prosecution. Contrary to the district court, we conclude Wilenchik is not entitled to qualified immunity for Plaintiffs' Fourth Amendment, First Amendment, or malicious prosecution causes of action. We agree with the district court, however, that Wilenchik is entitled to qualified immunity regarding Plaintiffs' Fourteenth Amendment selective prosecution claim.

*Fourth Amendment.* Plaintiffs may proceed with their cause of action under the Fourth Amendment. We find Plaintiffs alleged sufficient facts to show that by ordering the arrests, Wilenchik violated their clearly established constitutional rights.

**[12]** "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Id.* at 966. Further, in instances where, as here, the arresting officers themselves may have had probable cause, liability may extend to the supervisors who ordered the arrests but knew probable cause did not exist. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948-49 (2009) (observing that a supervisor can be liable for his or her acts, including orders to subordinates). Defendants' intent or motivation is irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

**[13]** Thus, while the district court correctly concluded the arresting officers may have had probable cause to believe the grand jury secrecy statute had been violated, the same may not be true for Wilenchik. A crucial question is whether the statute applies at all to the subpoenas issued, and, if so, supports the arrests. At this point, we lack sufficient information to decide one way or the other. Considering the totality of the circumstances, we must ask whether "a prudent person" who knows the subpoenas were in fact not issued by a grand jury or otherwise part of a grand jury matter, "would believe" Plaintiffs "committed a crime." *Dubner*, 266 F.3d at 966. As we have already explained, Plaintiffs have alleged sufficient facts to suggest Wilenchik knew Plaintiffs had not committed a crime by publishing the subpoena because he knew it was not truly grand jury material. They have thus alleged he violated a clearly established constitutional right by ordering their arrests without probable cause to do so.[5]

Wilenchik is not entitled to qualified immunity as to Plaintiffs' Fourth Amendment cause of action at this time.

**[14]** *First Amendment.* Plaintiffs also may proceed with their cause of action under the First Amendment. Plaintiffs contend Wilenchik violated their First Amendment rights by conducting an investigation culminating in their arrest—conduct that chilled their exercise of First Amendment rights. We have held that "to demonstrate a First Amendment violation, [Plaintiffs] must provide evidence showing that by his actions [Wilenchik] deterred or chilled [Plaintiffs'] political speech and such deterrence was a substantial or motivating factor in [Wilenchik's] conduct." *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1496 (9th Cir. 1994)) (internal quotation marks omitted). Plaintiffs need not show their "speech was actually inhibited or suppressed." *Id.*

---

[5]If it is true he had no role in the arrests, obviously there would be no liability.

Rather, our cases require "only a demonstration that defendants *intended* to interfere with [Plaintiffs'] First Amendment rights." *Id.* (internal quotation marks omitted). We thus consider "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* (quoting *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996), *vacated on other grounds*, 520 U.S. 1273 (1997)).

Plaintiffs have adequately alleged Wilenchik ordered the arrests not because he had probable cause to do so but because he intended to chill their protected speech. [R., Vol. 1, Doc. 4 at 23-24.] In *White v. Lee*, 227 F.3d 1214, 1226-29 (9th Cir. 2000), we held that an extremely intrusive investigation that did not culminate in an arrest—even when conducted pursuant to a valid mandate—could chill the exercise of First Amendment rights. This chilling effect is especially apparent when investigative activities are alleged to have been carried out in bad faith leading to the arrest and detention of the targets, as is alleged here. *See Branzburg v. Hayes*, 408 U.S. 665, 700 (1972) (explaining that prosecutors may not use investigative tactics to "expose[ ] for the sake of exposure" or "prob[e] at will and without relation to existing need" (quoting *Watkins v. United States*, 354 U.S. 178, 200 (1957); *DeGregory v. Attorney Gen. of N.H.*, 383 U.S. 825, 829 (1966)))*; see also In re Grand Jury Proceedings*, 5 F.3d 397, 400 (9th Cir. 1993) (suggesting bad-faith investigations implicate First Amendment rights).

Thus, it bears emphasizing that the allegation Wilenchik ordered the arrests, without probable cause, is especially important. The parties do not seem to dispute that late-night arrests and overnight detention would chill or silence a person of ordinary firmness. *See Skoog v. Cnty. of Clackamas*, 469 F.3d 1221, 1232 (9th Cir. 2006) (agreeing that searching someone's office and seizing materials is sufficient to chill or silence a person of ordinary firmness). Nor do they dispute that "[a]rresting someone in retaliation for their exercise of

free speech [is] violative of . . . clearly established [constitutional law]." *Beck v. City of Upland*, 527 F.3d 853, 871 (9th Cir. 2008). According to the amended complaint, Wilenchik ordered the arrests of Lacey and Larkin the same day an article critical of the investigation was published, even though he lacked probable cause to believe the grand jury secrecy statute had been violated.

**[15]** For these reasons, Plaintiffs have alleged sufficient facts to state a claim upon which relief can be granted and are entitled to proceed with their First Amendment cause of action. They alleged facts demonstrating Wilenchik, in bad faith, ordered the arrests without probable cause in response to the article about the grand jury, and that he intended to chill *The Phoenix New Times*' exercise of First Amendment rights.[6]

*Malicious Prosecution.* Plaintiffs additionally brought a § 1983 claim for malicious prosecution, which the district court dismissed because it found Plaintiffs failed to show a lack of probable cause for the arrests. In general, a claim of malicious prosecution is not cognizable under § 1983 if process is available within the state judicial system to provide a remedy. *Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985) (en banc). Indeed, in most cases, malicious prosecution is a state-law cause of action not cognizable in a § 1983 suit.

**[16]** We have, however, enunciated an important exception to this rule: malicious prosecution constitutes a deprivation of liberty without due process of law—and is thus a federal constitutional tort—when it is "conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights." *Bretz*, 773 F.2d at 1031. To prevail on a malicious prosecution cause of action in a § 1983 suit, Plaintiffs "must

---

[6]We again note that the question of probable cause is unresolved at this point due to disputed historical facts. This claim may need to be revisited as the record develops.

show that [Defendants] prosecuted [them] with malice and without probable cause, and that they did so for the purpose of denying [them] equal protection or another specific constitutional right." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995).

**[17]** Plaintiffs have adequately alleged the elements of a malicious prosecution. Wilenchik effected a criminal prosecution by ordering the arrests of Lacey and Larkin.[7] *See Phoenix Control Sys., Inc. v. Ins. Co. of N. Am.*, 796 P.2d 463, 468 (Ariz. 1990) ("Malicious prosecution requires 'an intent to cause an arrest.' ") (quoting Restatement (Second) of Torts § 37, cmt. b (1965)). Further, as explained above, Plaintiffs have alleged sufficient facts at this stage of the litigation to suggest Wilenchik acted with malice and lacked probable cause, and that the arrests violated Plaintiffs' clearly established First and Fourth Amendment rights. Wilenchik is thus not entitled to qualified immunity regarding Plaintiffs' malicious prosecution cause of action.

**[18]** *Equal Protection.* Finally, Plaintiffs argue Wilenchik violated the Equal Protection Clause by singling them out for investigation and arrests. To prevail on a § 1983 equal protection claim under the "Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose." *Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007) (citing *Wayte v. United States*, 470 U.S. 598, 608 (1985)). "To establish a discriminatory effect . . . , the claimant must show that similarly situated individuals . . .

---

[7]Under common-law malicious prosecution doctrine, to be liable for malicious prosecution an official must "initiate[ ] or procure[ ] the institution of criminal proceedings." Restatement (Second) of Torts § 653 (1977). Criminal proceedings are instituted when "process is issued for the purpose of bringing the person accused of a criminal offense before an official or tribunal whose function is to determine whether he is guilty of the offense charged . . . ." *Id.* § 654(2)(a). This may include an indictment, information, arrest warrant, or actual arrest. *Id.* § 654(2)(b) & cmt. c.

were not prosecuted." *Id.* at 1153 (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). "To show discriminatory purpose, a plaintiff must establish that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* (quoting *Wayte*, 470 U.S. at 610) (internal quotation marks omitted). The district court determined Plaintiffs failed to adequately plead that similarly situated individuals were not prosecuted and thus their selective enforcement claim failed. We agree.

We have emphasized that the "standard for demonstrating a violation of equal protection is a demanding one." *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068 (9th Cir. 2003) (internal quotation marks omitted). We also have emphasized, however, that the "showing necessary to obtain discovery is somewhat less: the defendant must produce some evidence that similarly situated defendants . . . could have been prosecuted, but were not." *Id.* at 1069 (internal quotation marks omitted). Under this standard, Plaintiffs had to allege that multiple publishers of Arpaio's address information were similarly culpable. *See United States v. Armstrong*, 517 U.S. 456, 466 (1996). Plaintiffs have failed to do this.

Plaintiffs were required to show that other publishers were similarly situated to *The New Times* regarding both elements of Arizona's privacy statute: (1) knowingly making available a public official's personal information on the world wide web, if (2) the dissemination of the information poses an "imminent and serious threat to the [public official's] safety or the safety of that person's immediate family and the threat is reasonably apparent to the person making the information available on the world wide web to be serious and imminent." ARIZ. REV. STAT. § 13-2401(c). Plaintiffs have plainly shown that multiple websites published Arpaio's personal information. But regarding the second element, Plaintiffs have completely failed to allege that the various publishers posed similar threats to Arpaio and his family.

Plaintiffs offer no facts to support the idea that publication of Arpaio's information on a political party register or county real estate roll posed the *same threat* as its publication in connection with aggressive allegations of public corruption. The Amended Complaint states only: "There was no evidence that Arpaio was then, or ever, under any credible threat or 'imminent harm' as a result of the publication of his home address on *The New Times* website. After all, his home address and personal information [were] widely available on other websites prior to the article." [First Am. Compl. ¶ 41.] The Lebowitz memorandum attached to the Amended Complaint provides greater detail—it lists the websites that published Arpaio's information and singles out *The New Times* as having an anti-Arpaio agenda—but it still offers no facts suggesting that multiple publications of Arpaio's address posed similar threats.[8] This is important because, as the privacy statute implicitly recognizes, highlighting a controversial public figure's address—and no one else's—is fundamentally very different than burying his address in an organizational list potentially containing scores of entries. Thus, the mere fact that multiple websites published Arpaio's address does not mean every website posed similar threats.

[19] In sum, although distinguishing between publications on the basis of whether they were pro- or anti-Arpaio would have been improper, distinguishing them on the basis of

---

[8]This memorandum states that Maricopa County, the Election Commission, and the Republican Party also published Arpaio's address. We note that Maricopa County's website would be shielded from liability under Arizona law. *See* Ariz. Rev. Stat. § 13-2401(B). We also note that the Lebowitz memorandum, if anything, supports a finding that in publishing Arpaio's address, *The New Times* posed an especially serious threat to his safety. *See* Lebowitz Memo. at 8-9 ("None of the other web cites [sic], historically, have resorted to writing articles against the Sheriff, using language that is inflammatory, insulting, vituperative, and the like—all of which having the effect of attracting those of the 'lunatic fringe' who, for reasons of their own, view themselves as the Sheriff's sworn enemies . . . .").

whether they posed a threat to Arpaio—an element of the Arizona statute—was legitimate. Plaintiffs have simply failed to allege any facts suggesting that all websites that published Arpaio's address posed the same threat to Arpaio and his family. Thus, we have no basis to infer that "similarly situated defendants . . . could have been prosecuted, but were not." *Arenas-Ortiz*, 339 F.3d at 1068 (quotation marks omitted). Finally, we note that Plaintiffs knew of threats made to Arpaio when they published his address information. Plaintiffs do not allege that other publishers had similar information.

\* \* \*

In sum, Plaintiffs may proceed with their causes of action under the First and Fourth Amendments, and with their malicious prosecution allegations. We emphasize, however, that at this stage of the proceedings, the record is sparse as to the evidence surrounding the grand jury and Wilenchik's motives, and our analysis is based on the pleadings alone. Wilenchik may have had the power to issue the subpoenas and may have believed they were valid, or, as discussed above, he may be able to show he was not involved in the arrests. But at this stage of the proceedings, Plaintiffs are entitled to go forward with their case on these claims.

## 2.  Arpaio

**[20]** We agree with the district court that the allegations against Arpaio fail to state a claim. First, Arpaio's efforts to persuade the county attorneys to pursue charges against Plaintiffs for violating the privacy statute do not violate the Constitution. The district court was therefore correct to grant Arpaio qualified immunity for all acts before the arrests.

**[21]** Second, Plaintiffs' allegations regarding Arpaio's involvement in the arrests are too insubstantial to sustain a § 1983 claim. Under § 1983, Arpaio can be liable for the

actions of his subordinates only if (1) he was personally involved in a constitutional violation, or (2) there was a "sufficient causal connection" between his wrongful conduct and the constitutional violation. *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989); *see also Starr v. Baca*, 633 F.3d 1191, 1194 (9th Cir. 2011) (supervisors are "individually liable in § 1983 suits when culpable action . . . is directly attributed to them"). Sufficient personal involvement could include "culpable action or inaction in the training, supervision, or control of . . . subordinates, . . . acquiescence in the constitutional deprivations of which the complaint is made, or conduct that showed a reckless or callous indifference to the rights of others." *Starr*, 633 F.3d at 1195.

**[22]** The district court correctly determined Plaintiffs failed to meet this standard in their original complaint and gave them an opportunity to amend. In their amended complaint, Plaintiffs again failed to allege facts showing Arpaio personally knew the subpoenas could not support a violation of the grand jury secrecy statute, and, despite that knowledge, was personally involved in ordering or carrying out the late-night arrests. Indeed, the amended complaint, even taken in the light most favorable to Plaintiffs, does not demonstrate a sufficient causal connection between Arpaio's actions and constitutional deprivations.

For example, the amended complaint makes only general allegations that Arpaio abused his power[, First Am. Compl. ¶ 19]; indirectly prompted Wilenchik to issue improper subpoenas and order the arrests[, *id.* ¶ 21]; and conducted the arrests via the "Selective Enforcement Unit" [*id.* ¶ 111]. Plaintiffs say Arpaio did all of this with "improper and unconstitutional motives." [*Id.* ¶ 114]. Nowhere, however, do Plaintiffs set forth facts suggesting that Arpaio, rather than one of his colleagues or associates, was closely connected to the arrests—or that he lacked probable cause to carry out any of the arrests. Indeed, the allegations are long on conjecture but short on the factual nexus necessary to sustain a claim. *See*

*Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (to sustain a § 1983 claim, "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights"). Through confusing and misleading "and/or" formulations, the amended complaint has forced the district court and this court on appeal to try to figure out who did what. Especially in the immunity context, such bare assertions do not meet our minimal pleading standards. *See Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970-72 (9th Cir. 2009). Even with generous pleading standards, we agree with the district court that the amended complaint did not cure the deficiencies identified in the court's initial order dismissing the original complaint.

**[23]** Thus, the amended complaint's allegations regarding Arpaio are conclusory and devoid of "sufficient factual matter" to suggest his actions infringed clearly established constitutional rights. *See Iqbal*, 129 S. Ct. at 1949. Plaintiffs simply do not provide enough "factual content" to allow us to draw a "reasonable inference" that Arpaio knew of the infirmities of the subpoenas and arrests. *Id.* According to the Supreme Court, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. And that is, at most, what we find here— conclusions not yet entitled to the assumption of truth. Without sufficiently specific factual allegations, Plaintiffs cannot overcome Arpaio's claims to qualified immunity, and the district court was correct to dismiss the claims against him.**⁹**

## C.   State Law Claims

In its first order, the district court dismissed for failure to state a claim Plaintiffs' state-law negligence and malicious

---

**⁹**That is not to say that Plaintiffs could not conceivably develop sufficient facts to state a claim. They just have not done so with the amended complaint.

prosecution claims, but it offered Plaintiffs the opportunity to amend their complaint. They did so, and in its second order, the district court refused to revisit the state law claims, explaining that because it had dismissed all of the federal claims, it no longer had supplemental jurisdiction over the remaining state law claims. The district court then remanded the state claims to state court.

**[24]** As an initial matter, the district court's justification for remanding the state claims was incorrect. The Supreme Court recently held that dismissal of federal claims does not automatically deprive district courts of subject matter jurisdiction over any supplemental claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866 (2009). Rather, the district court retains discretion whether to exercise supplemental jurisdiction over state law claims even after all federal claims are dismissed. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."). Where a district court "dismiss[es] every claim over which it had original jurisdiction," it retains "pure[ ] discretion[ ]" in deciding whether to exercise supplemental jurisdiction over the remaining claims. *Carlsbad Tech.*, 129 S. Ct. at 1866. Thus, the district court should have exercised its discretion and decided whether it would have been appropriate to keep the state claims in federal court. In any event, because we reverse the district court's dismissal of some of Plaintiffs' federal claims, the district court should reconsider on remand whether it should exercise supplemental jurisdiction over the state law claims. We realize, of course, that pursuant to the district court's remand, the parties are currently litigating the state law issues in Arizona court.

Plaintiffs also argue that the district court, in its first order, improperly dismissed their state law claims. Because the district court remanded all of the state law claims in its second order, however, its dismissal of the state law claims in its first

order is not appealable. "The amended complaint supersedes the original, the latter being treated thereafter as non-existent." *Loux v. Rhay,* 375 F.2d 55, 57 (9th Cir. 1967). "By filing an amended complaint, plaintiff waives any error in the ruling to the original complaint." *Id.*

We thus emphasize that the district court's ruling in its first order regarding the state law claims is no longer binding on either party.[10] Indeed, the district court's decision in its second order to remand all of the state claims rather than to discuss their merits supersedes its earlier order, and we therefore decline to reach the merits of the first order.

## D.  Federal and State RICO Claims

**[25]** The district court dismissed Plaintiffs' federal and state RICO claims because they failed to allege any of the predicate acts necessary for liability under either the federal or state RICO statutes. *See* 18 U.S.C. § § 1961-1968; ARIZ. REV. STAT. § § 13-2301–13-2322. We agree.

The federal statute defines racketeering to include a variety of criminal acts that are indictable under federal and state law, including "murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical" and other related crimes. 18 U.S.C. § 1961(1). The Arizona RICO statute further defines racketeering as any of a number of criminal activities committed for "financial gain." ARIZ. REV. STAT. § 13-2301(D)(4). Plaintiffs, both in the complaint and again in their briefs on appeal, offer only vague allegations with no factual support that defendants engaged in any of the above predicate crimes, much less that they engaged in them for financial gain. Such vague allegations simply are not enough to defeat a motion to dismiss.

---

[10]The district court did incorporate much of the first order into the second order. When it did, however, it did so explicitly. That was not the case regarding the state law claims.

We therefore affirm the district court's order on these claims.

### E. Maricopa County

In their amended complaint, Plaintiffs alleged Maricopa County should be liable under § 1983 because Arpaio, Wilenchik, and Thomas were policymakers whose decisions and acts represented county policy, thereby making the county directly liable. They also alleged the county board's approval of Wilenchik as special prosecutor should subject it to direct liability. Since the district court had previously concluded Plaintiffs had suffered no constitutional harm, it dismissed all of Plaintiffs' claims against the County.

[26] Because we conclude Plaintiffs have alleged sufficient facts to show a constitutional violation as to the arrests, we reverse the district court's decision and direct it on remand to reconsider the claims against Maricopa County in the first instance.[11]

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal of the claims against Thomas on absolute immunity grounds and those against Arpaio on qualified immunity grounds. We also AFFIRM the district court's decision to grant qualified immunity to Wilenchik regarding Plaintiffs' equal protection claim against Wilenchik. We REVERSE, however, the district court's granting Wilenchik qualified immunity as to Plaintiffs' First Amendment, Fourth Amendment, and malicious prosecution claims. We REMAND the

---

[11]As a final matter, Defendants filed a motion to strike the portion of Plaintiffs' reply brief that addressed the district court's dismissal of Plaintiffs' § 1983 conspiracy claim. We do not consider new issues raised for the first time in a reply brief. *Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990). We therefore grant Defendants' motion to strike.

case to the district court with instructions to reconsider the claims against Maricopa County and to proceed with the case in a manner consistent with this opinion. Finally, we GRANT Defendants' motion to strike the portion of Plaintiffs' reply brief that addressed the district court's dismissal of Plaintiffs' § 1983 conspiracy claim.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

The parties shall bear their owns costs on appeal.

---

BYBEE, Circuit Judge, concurring in part and dissenting in part:

This case concerns an investigation initiated by "America's toughest sheriff," Joseph Arpaio, against his political enemies in the local news media. In the words of Arpaio's own director of legal affairs, Arpaio had targeted the *Phoenix New Times* because the paper had been "historically anti-Arpaio." Arpaio's excuse for demanding prosecution of the *Phoenix New Times* was that its decision to post Arpaio's home address on its website allegedly violated an obscure Arizona statute that prohibits dissemination of a law enforcement officer's "personal information," if doing so would pose an "imminent and serious threat" to the officer or his family, and such threat is "reasonably apparent" to the publisher. ARIZ. REV. STAT. § 13-2401(A). Never mind that Arpaio's address was already publicly available through numerous other websites, including the websites of Maricopa County and the local Republican Party. Despite this and the fact that no one had ever been prosecuted under the statute, Arpaio used his considerable political clout in an attempt to pressure various prosecutors into charging the *Phoenix New Times*. After years of investigation, two different County Attorneys found no grounds for prosecution and refused to cave into Arpaio's

demands. Undeterred, Arpaio eventually managed to persuade Maricopa County Attorney Andrew Thomas to appoint Dennis Wilenchik as special prosecutor to investigate the *Phoenix New Times*. When Wilenchik issued subpoenas to the *Phoenix New Times*, the paper responded by publicizing the content of the subpoenas. Arpaio obliged by ordering the arrest, without a warrant, of *Phoenix New Times* publishers Michael Lacey and Jim Larkin for violating Arizona's grand jury secrecy laws. The only problem was that no grand jury had ever been empaneled. Thus, the subpoenas were invalid ab initio.

Accepting the Plaintiffs' version of the facts—which at this stage of the litigation we must—this is a sordid tale of abuse of public office. Nevertheless, despite the complaint's detailed allegations of reprehensible conduct, the majority concludes that Arpaio is entitled to qualified immunity on the grounds that Plaintiffs failed to adequately plead that Arpaio was personally involved in the arrests. Since the complaint details Arpaio's extensive involvement in the alleged violations of Plaintiffs' clearly established constitutional rights, I respectfully dissent from the majority's conclusion that Arpaio is entitled to qualified immunity. I also respectfully dissent from the majority's conclusion that Special Prosecutor Wilenchik is not liable for selective prosecution, because the complaint shows that Wilenchik targeted the *Phoenix New Times* for publicizing Arpaio's home address while deliberately disregarding the fact that numerous other websites had done the same. I concur in the remainder of the majority's opinion.[1]

---

[1]Specifically, I agree with the majority that County Attorney Thomas is entitled to absolute immunity, and I agree that Special Prosecutor Wilenchik is not entitled to absolute immunity. I also agree that Wilenchik is not entitled to qualified immunity as to the First Amendment and Fourth Amendment claims. Accordingly, I join Part II.A, along with the relevant portions of Part II.B (except to the extent it holds that Wilenchik is entitled to qualified immunity on the Fourteenth Amendment claim for selective prosecution) of the majority's opinion.

I

The majority concludes that the complaint's allegations are "too insubstantial to sustain a § 1983 claim" under the First, Fourth, and Fourteenth Amendments. Maj. Op. at 7646. At this stage of the proceedings, however, Plaintiffs need not prove anything to overcome Arpaio's assertion of qualified immunity. They need only "plead sufficient factual matter to show that" Arpaio acted "for the purpose of" violating Plaintiffs' constitutional rights. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948-49 (2009). We must accept all factual allegations in Plaintiffs' complaint as true and construe the complaint in the light most favorable to Plaintiffs. *Shanks v. Dressel*, 540 F.3d 1082, 1084 n.1 (9th Cir. 2008). The action may proceed if the facts in the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

Although the factual allegations in the complaint are quite detailed, the remainder of the complaint was not drafted in anticipation of *Iqbal*. Nevertheless, even under *Iqbal*, Plaintiffs have alleged sufficient facts to sustain their claims. First, the complaint makes clear that Arpaio never had grounds for investigating Plaintiffs for violation of the Arizona privacy statute. Although Plaintiffs had published Arpaio's home

---

I also agree with the majority that the district court erred in remanding Plaintiffs' state law claims without considering whether to exercise its discretion to retain supplemental jurisdiction over these claims. I therefore join Part II.C of the majority's opinion.

On the state and federal RICO claims, I agree that the district court correctly concluded that Plaintiffs failed to state a claim. Accordingly, I join Part II.D of the majority's opinion.

Finally, because we reverse the district court's grants of qualified immunity in part, I agree that on remand, the district court should reconsider Plaintiffs' claims against Maricopa County. I therefore join Part II.E of the majority's opinion.

address on its website, the statute prohibits publication only when it is "reasonably apparent" that doing so would pose an "imminent and serious threat" to Arpaio or his immediate family. ARIZ. REV. STAT. § 13-2401(A). The complaint plainly alleges that Arpaio's home address was already publicly available, and that therefore it could not have been "reasonably apparent" to Plaintiffs that publicizing the address on the *Phoenix New Times's* website would pose any additional threat to Arpaio or his family. Plaintiffs further point out that Arpaio himself never felt imminently threatened by publication of his address, because he waited nearly one year before asking prosecutors to investigate.[2] First Amd. Compl. at 11-12. The complaint also cites various reports from prosecutors in the Pinal County Attorney's office noting that the case lacked merit precisely because there was no evidence that publication posed an "imminent and serious threat" to Arpaio. *Id.* at 12-13.

Second, the complaint plainly charges that Arpaio had no basis for ordering Plaintiffs' arrest. Plaintiffs were never charged or arrested for violating the Arizona privacy statute. Instead, they were arrested for publicizing the content of subpoenas issued as part of Special Prosecutor Wilenchik's investigation. Although it is a misdemeanor in Arizona to publicize the contents of a grand jury proceeding, including subpoenas, *see* ARIZ. REV. STAT. § 13-2812(A), no grand jury had ever been empaneled, and, as Wilenchik and Arpaio knew, the subpoenas were therefore never valid.

Despite these detailed factual allegations, the majority remarkably concludes that Plaintiffs' claims fail for want of "specific factual allegations," Maj. Op. at 7648, including "facts suggesting that Arpaio . . . was closely connected to the

---

[2]The complaint also claims that, after this lawsuit was filed, "Arpaio mailed out Partisan Nomination Petitions, asking citizens to re-elect him for Sheriff and publicizing his home address on the Petition." First. Amd. Compl. at 11.

arrests," *id.* at 7647. In particular, the majority emphasizes that the complaint "failed to allege facts showing Arpaio personally knew the subpoenas could not support a violation of the grand jury secrecy statute." *Id.* I question whether the majority's conclusion is well-grounded in either law or fact. As to law: The majority's focus on whether Plaintiffs pled specifics about Arpaio's internal thought processes on the subpoenas effectively demands that plaintiffs in § 1983 officer suits plead with a heightened level of specificity—a demand that neither we nor the Supreme Court have ever imposed. As the Supreme Court stated in *Iqbal*, all that is required at the pleading stage is sufficient facts to permit us "to draw the reasonable inference that the defendant is liable for the misconduct alleged." 129 S. Ct. at 1949. Nowhere has the Supreme Court or this court ever referred to the majority's undefined "specificity" standard.

The majority correctly lists the two avenues under *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989), through which a supervisory officer may be liable in a § 1983 suit: (1) if the officer was "personal[ly] involve[d] in the constitutional deprivation," or (2) if there exists "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* at 646. But after erroneously concluding that there was no "personal involvement" by Arpaio in the episode, the majority fails to offer any analysis of why Arpaio is not liable under the second prong.

As to fact: Applying the *Iqbal* and *Hansen* standards to Arpaio's conduct, Plaintiffs have pled sufficient facts to permit us to infer that Arpaio was personally involved, and that his conduct set into motion a chain of events that he should have known would lead to the wrongful arrests. Plaintiffs allege that Arpaio had demanded that the County Attorney prosecute the *Phoenix New Times* despite no cause for believing that Plaintiffs had violated the Arizona privacy statute. First Amd. Compl. at 9-11. Attached to the complaint is a letter written by Arpaio's own legal director, Ron Lebowitz,

acknowledging that Arpaio was targeting the *Phoenix New Times*, but not the other websites that had also publicized Arpaio's home address, because the paper had been "historically anti-Arpaio," had the "purpose [of] destroy[ing] the Sheriff's career," and had published "articles against the Sheriff, using language that is inflammatory, insulting, vituperative, and the like." First Amd. Compl., Ex. 1, at 8. Plaintiffs further allege that after failing to persuade the Pinal County Attorney to prosecute the case, Arpaio managed to persuade Maricopa County Attorney Andrew Thomas to hire Wilenchik as special prosecutor. First Amd. Compl. at 15, 18. Although Arpaio denied ordering the arrests, Wilenchik "has publicly claimed the arrests were conducted, authorized, approved, and/or directed by Arpaio and/or his aides." *Id.* at 24-25. Further, "Wilenchik's staff admits that they advised the Sheriff with respect to the arrests." *Id*. at 25. Finally, "Wilenchik's former partner, William French, . . . confirmed that Wilenchik did indeed authorize and advise Arpaio to conduct the arrests." *Id.*

The existence of such substantial factual disputes should normally weigh against granting a motion to dismiss. Instead, the majority expresses frustration with the dueling narratives cited in the complaint, complaining that Plaintiffs "ha[ve] forced . . . this court . . . to try to figure out who did what." Maj. Op. at 7648. But that is beside the point. Our job at this stage of the litigation is not to engage in factfinding or to determine whose version of the facts to believe. That is the purpose of discovery and trial. For now, we must accept Plaintiffs' version of the facts as true. *See Shanks*, 540 F.3d at 1084 n.1.

Reading the facts in the light most favorable to Plaintiffs, it is more than reasonable to infer that Arpaio had acted with intent to violate Plaintiffs' constitutional rights. Even if Arpaio did not physically participate in Plaintiffs' arrests, there surely is an allegation of "a sufficient causal connection

between [Arpaio's] wrongful conduct and the constitutional violation." *Hansen*, 885 F.2d at 646.

I would allow the action to proceed against Arpaio.

II

With respect to Special Prosecutor Wilenchik's liability, I agree with the majority that Wilenchik is not entitled to qualified immunity for the alleged First and Fourth Amendment violations. I disagree, however, with the majority's conclusion that Plaintiffs are barred from pursuing their claim for selective prosecution under the Fourteenth Amendment against Wilenchik.

To make a claim for selective prosecution, Plaintiffs must establish (1) that similarly situated persons were not prosecuted, and (2) that the defendants were motivated by a discriminatory purpose. *See Rosenbaum v. City & Cnty. of S.F.*, 484 F.3d 1142, 1152-53 (9th Cir. 2007). For Plaintiffs to proceed past a motion to dismiss on this claim, they need only produce "some evidence that similarly situated defendants . . . could have been prosecuted, but were not." *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068 (9th Cir. 2003) (internal quotation marks omitted). Here, the complaint alleges that other websites that published Arpaio's home address, such as the websites of Maricopa County and the local Republican Party, were similarly situated to the *Phoenix New Times*, but were not prosecuted. First Amd. Compl. at 11-12, 33.

The majority faults the Plaintiffs because the complaint fails to allege that publication on the other websites "posed similar threats to Arpaio and his family." Maj. Op. at 7644. But this factor would be relevant only if we accept the Wilenchik's factual assertion that publication on the *Phoenix New Times's* website posed an "imminent and serious threat" to Arpaio or his family in the first place. In the complaint, which we must accept as true, Plaintiffs repeatedly emphasize

that there was never any evidence suggesting that the publication of Arpaio's address—by either the *Phoenix New Times* or by any of the other websites which had published the same information—ever posed an "imminent and serious threat" to Arpaio. *See* First Amd. Compl. at 10 ("There was no evidence that Arpaio was then, or ever, under any credible threat of 'imminent harm' as a result of the publication of his home address on *The New Times* web site."); *id.* at 11 ("Arpaio, himself, obviously did not feel any 'imminent' threat from the . . . article, because he was content to wait for many months before requesting any investigation. . . . In fact, Arpaio has continued, to this day, to publicize and publish his home address to citizens and the public at large."). Because we can reasonably infer from Plaintiffs' well-pleaded facts that publication of Arpaio's address by both the *Phoenix New Times* and the other websites never posed any threat to Arpaio, Plaintiffs do not need to allege that publication by the other websites posed an "imminent and serious threat" in order to show that the other websites were similarly situated.[3]

Even worse, the majority takes it upon itself to decide not only that the *Phoenix New Times* posed a threat to Arpaio and his family, but that the other websites did *not* pose a threat. Thus, the majority finds for itself (on an appeal from a motion to dismiss) that "highlighting a controversial figure's address —and no one else's—is fundamentally very different than burying his address in an organizational list potentially containing scores of entries." Maj. Op. at 7645. The majority concludes, again on its own authority, that "the mere fact that multiple websites published Arpaio's address does not mean

---

[3]Plaintiffs also have alleged sufficient facts to show that Wilenchik acted with discriminatory purpose. The invalid subpoenas, as summarized in the complaint, sought any materials in Plaintiffs' possession, including confidential sources, relating to any news article "that was critical of Sheriff Arpaio." First Amd. Compl. at 19. This fact alone is sufficient to permit one "to draw the reasonable inference" that Wilenchik acted with the purpose to discriminate against Plaintiffs on the basis of their "anti-Arpaio" views. *Iqbal*, 129 S. Ct. at 1949.

every website posed similar threats." *Id.* Finally, the majority applauds the very First Amendment deprivation claimed by the plaintiffs: the majority finds that the *Phoenix New Times* "posed an especially serious threat to [Arpaio's] safety" precisely because it had used "inflammatory, insulting, [and] vituperative" language in its articles criticizing Arpaio. *Id.* at 7645 n.8 (quoting Arpaio's director of legal affairs, Ron Lebowitz). Accordingly, the majority concludes, it was proper for Wilenchik to prosecute the *Phoenix New Times* alone because it alone "posed a threat to Arpaio." *Id.* at 7646. In my view, the majority's analysis only confirms that Plaintiffs should have their opportunity to prove that publication of Arpaio's address posed no imminent threat to him and that Wilenchik's decision to single out the *Phoenix New Times* was a poorly disguised effort to silent Arpaio's critics.

Since I believe Plaintiffs have adequately alleged that Wilenchik failed to prosecute similarly situated entities and did so with discriminatory purpose, I would reverse the district court's grant of qualified immunity as to this claim.

III

Although the Supreme Court has retired the liberal no-set-of-facts standard that we traditionally applied when considering motions to dismiss, *see Iqbal*, 129 S. Ct. at 1944; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562-63 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41 (1957)), that does not give us license to disregard factual allegations in a complaint as we see fit. But in dismissing Plaintiffs' selective prosecution claim against Wilenchik, the majority relies on a version of the facts that is contrary to the factual allegations in the complaint. The majority also ignores the Supreme Court's admonishment in *Iqbal* against requiring plaintiffs to plead "detailed factual allegations" in order to proceed past a motion to dismiss. 129 S. Ct. at 1949 ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-

defendant-unlawfully-harmed-me accusation." (quoting *Twombly*, 550 U.S. at 555)). Yet by dismissing Plaintiffs' complaint against Arpaio for failure to plead sufficient details of Arpaio's personal involvement and mental state in this unfortunate episode, the majority has raised pleading standards well beyond what we or the Supreme Court have ever required.

For the foregoing reasons, I respectfully dissent on the issue of Arpaio's liability as to all constitutional claims. I also respectfully dissent on the issue of Wilenchik's liability for selective prosecution.